# 56 AMERICAN SUGAR REFINING CO. *v.* FANCHER.

AMERICAN SUGAR REFINING COMPANY, Respondent, *v.* CHARLES H. FANCHER, Assignee, etc., of CHARLES BURKHALTER and Another, Appellant, Impleaded with CHARLES BURKHALTER and Others, Defendants.

*Sale of goods induced by fraud — when it may be rescinded by the vendor — when a constructive trust is not created as to the proceeds of the portion of the goods sold by the vendee prior to the rescission — between creditors equality is equity.*

A sale of goods induced by fraud is voidable at the vendor's option. On discovering the fraud, he may rescind the contract and reclaim the goods from the fraudulent vendee; and as an assignee for the benefit of creditors is not a *bona fide* purchaser, but takes only the defeasible title of his assignor, the vendor in such case may also compel a return of the goods from him.

To the equitable doctrine that, as between creditors, equality is equity, there is no exception founded on the greater supposed sacredness of one debt over another, or on the fact that it arose out of a violation of duty, or that its loss involves greater apparent hardship.

When a vendor waits until his vendee, having the title, possession and absolute right of disposition, as his own property, of the merchandise sold to him, has disposed of the same, and then, to obtain an advantage over the creditors of the vendee, who is insolvent and has in the meantime made a general assignment for the benefit of creditors, rescinds the sale induced by fraud, a constructive trust as to the proceeds of the sale of the portion of such merchandise, sold by the vendee prior to the rescission by the vendor of the original sale, will not be held by courts of equity to have been created for the benefit of the vendor.

FOLLETT, J., dissenting.

APPEAL by the defendant, Charles H. Fancher, assignee, etc., of Charles Burkhalter and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 24th day of May, 1894, upon the decision of the court rendered at the New York Special Term adjudging that the plaintiff recover of the appellant $10,606.62, and that the appellant execute and deliver to the plaintiff an assignment of such of the outstanding accounts and bills belonging to the firm of Charles Burkhalter & Co. prior to its failure as may represent any portion of any merchandise mentioned in the complaint as having been sold and delivered by the plaintiff to the firm of Burkhalter & Co., and further adjudging that the payment of the same shall be a first lien and charge upon the moneys and assets in the hands of the appellant as assignee of the said firm of Burkhalter &

Co. and upon the proceeds thereof; also an appeal from the interlocutory judgment entered in said clerk's office on the 24th day of May, 1894, upon the report of a referee, with notice of an intention to bring up for review on such appeal said interlocutory judgment.

*Frederick Seymour*, for the appellant.

*Frederick R. Kellogg*, for the respondent.

PARKER, J.:

About a month before C. Burkhalter & Co. made a general assignment to this defendant for the benefit of creditors, the plaintiff sold and delivered to them on credit a quantity of sugar at the agreed price of $19,124.41. The sale was induced by false and fraudulent representations made by C. Burkhalter & Co. as to their solvency.

Twenty-six days after the execution of the general assignment, plaintiff served upon the assignee a notice in writing rescinding the sale on account of the fraud and demanding a return of so much of the sugar as was then in the possession of the assignee, and that he account for and deliver to the plaintiff the proceeds of such goods as had been disposed of.

All of the sugar except $2,400 worth was before the assignment sold and delivered to the customers of the firm upon various terms of credit, which had not then expired, and that which remained unsold plaintiff obtained possession of, after serving the notice of rescission, through an action brought for the purpose. Thereafter this suit was commenced, which has resulted in a judgment against the defendant for $11,809.83, which is adjudged to be a "first lien and charge upon any and all moneys and assets of every nature now or hereafter in the hands of the said defendant, formerly of the said firm of C. Burkhalter & Co.," and the defendant is also directed to execute and deliver to the plaintiff instruments of assignment necessary to transfer all accounts and bills and claims receivable representing any portion of the merchandise sold by plaintiff to C. Burkhalter & Co.

The learned referee, in presenting the reasons which led him to make a report in favor of the plaintiff, laid down certain propositions

as a foundation for his argument which do not admit of dispute, viz.: A sale of goods induced by fraud is voidable at the vendor's option. On discovering the fraud he may rescind the contract and reclaim the goods from the fraudulent vendee. As an assignee for the benefit of creditors is not a *bona fide* purchaser, but takes only the defeasible title of his assignor, the vendor may also compel a return of the goods from him.

It may be observed that the legal principles thus accurately stated were successfully invoked in the possessory action by means of which the plaintiff compelled a return of all the merchandise which Burkhalter & Co. had not sold prior to the assignment. But the sales actually made by Burkhalter & Co. were to *bona fide* purchasers, and the attempted rescission of the contract did not, therefore, affect the title of such goods. This embarrassing fact was met with the assertion that the plaintiff nevertheless had the right to repudiate the contract; to treat the proceeds as a substitute for the merchandise sold, and to pursue them, whatever their form, into the hands of the fraudulent vendee, and fasten its equitable claim upon them.

Our attention has not been called to any case which in terms either affirms or denies this position, and we are to inquire whether it is well grounded in principle.

The respondent contends that, notwithstanding the passing of the title to a purchaser for value and without notice, the fraudulent vendee is chargeable in equity with the proceeds as a constructive trustee for the benefit of the defrauded vendor. That the trust arises *ex maleficio* out of the active fraud of Burkhalter & Co., and attaches to the property or its proceeds while in the hands of the vendee or his transferee with notice.

Whether the effect of the fraud was to create an enforcible trust we must inquire, for otherwise the fraud would not operate to secure the plaintiff any preference over the other creditors of Burkhalter & Co. "The equitable doctrine that as between creditors equality is equity, admits, so far as we know, of no exception founded on the greater supposed sacredness of one debt, or that it arose out of a violation of duty, or that its loss involves greater apparent hardship." (*Matter of Cavin* v. *Gleason*, 105 N. Y. 256.) In that case the debtor took nearly all of a trust fund and paid his

personal debts with it, and the court held, that as to the amount thus paid out, the trust creditor could have no preference.

The doctrine of that case is applicable to this one, and should perhaps be allowed to dispose of it without other discussion.

Burkhalter & Co., upon the delivery of the sugar to them in pursuance of their contract with the plaintiff, became vested with the title and possession notwithstanding the fraud, subject, however, to the right of the vendor to rescind the contract if it should so elect. (*Powers* v. *Benedict*, 88 N. Y. 605; *Goodwin* v. *Wertheimer*, 99 id. 152; *Wise* v. *Grant*, 140 id. 593.)

Before the plaintiff concluded to rescind the contract, and reclaim the property, that portion of it, which is now the subject of controversy, was, in the usual course of business, sold and delivered to various customers of the firm, who were purchasers for value and without notice. It was then too late for the plaintiff to reclaim the property. The title and possession had become vested in persons protected as a rule of necessity from the original vendor. "A contrary principle would endanger the security of commercial transactions and destroy that confidence upon which what is called the usual course of trade materially rests." (*Root* v. *French*, 13 Wend. 572.)

Then came the hour of the general assignment, which found the plaintiff apparently content with the then existing relation of debtor and creditor. By the instrument then executed all of the debtor's property passed to the assignee for administration and distribution. The proceeds of the sugar, necessarily, passed with the other assets of Burkhalter & Co. It was their sugar when sold. True, it might have been otherwise had the plaintiff elected to rescind the contract and reclaim the property, but as it did not do this the vendees in selling it sold their own property, and the proceeds of it belonged to them when the assignment was made. Then the plaintiff's relation to Burkhalter & Co., as to the sugar sold, was that of a contract creditor, the only difference between it and the other creditors being that fraud entered into the making of the contract between it and the common debtors.

But this fraud did not entitle it to preference over the other creditors in the distribution of assets. (*Matter of Cavin* v. *Gleason*, *supra*.) The case would, we think, be well disposed of if discussion should be stopped at this point. But the elaborate and

careful argument intended to make it clear that a trust *in invitum* was brought into existence by the fraud of the Burkhalters, renders it entirely proper that the question be given some part at least of the consideration in the opinion which it received in the consultation of the court.

It is not out of place to say here that the courts have less generously charged debtors as trustees *ex maleficio* in cases of personal property than they have in real estate.

ALEXANDER, C. B., in *Nemham* v. *Macy* (13 Price, 749), said: "The cases of compensation in equity I consider to have grown out of the jurisdiction of the courts of equity, as exercised in respect of contracts for the purchase of real property, where it is often ancillary as incidentally necessary to effectuate decrees of specific performance."

While the equitable remedy of following the proceeds of property doubtless arose in the manner suggested, it has been so extended as to include, in certain cases, the proceeds of personal property.

To these cases a general reference will be made later, but for the present it may be said that they emphasize the fact to be that the courts have not extended the doctrine so generally over personalty as over real estate. One reason for it is suggested in one of the opinions in *New Zealand, etc., Co.* v. *Watson* (7 Q. B. Div. 374):

"I do not desire to find fault with the various intricacies and doctrines connected with trusts, but I should be very sorry to see them introduced into commercial transactions."

The leading authors who have attempted anything like a full discussion of the subject of trusts, in their consideration of trusts raised by construction of equity, without reference to any intention of the parties, either expressed or presumed, and known as constructive trusts, have made use of language in a general discussion of the subject broad enough perhaps to include the situation presented by this record. Mr. Perry in his work on Trusts (§ 166) says: "There is another large class of trusts which arise from frauds committed by one party upon another. Thus, if one party procures the legal title to property from another by fraud, or misrepresentation, or concealment * * * equity will convert such party thus obtaining the property into a trustee." And in Pomeroy's Equity Jurisprudence (§ 1053) it is said: "In general, whenever the legal title to property,

real or personal, has been obtained through actual fraud, misrepresentations, concealments  *  *  *  which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired.  *  *  *  "

The same position is asserted and in substantially the same language in Bispham Equity (§ 91); Bigelow on Fraud (437); Story Equity Jurisprudence (§ 1263).

But when these authors undertake to support the general rule thus laid down, by presenting the different classes of cases in which courts of equity have made use of the principle of a division between the legal estate in one and the equitable estate in another to construct a trust where none was intended by either party, they are obliged to, and do, cite cases growing out of transactions in real estate almost exclusively.  A practical reason for the distinction, in addition to that suggested by the quotation taken from the *New Zealand Case* (*supra*), may be found in the fact that when contracts relating to, or conveyances of, real estate have been procured through fraud, resort must be had to the courts to set aside the contracts or to cancel the deeds, and reinvest the defrauded vendors with the title, whereas a sale and delivery of personal property vesting title and possession in a fraudulent vendee, may be rescinded by the vendor, whereupon the title is restored to him and the right accrues to recover possession of the goods.

While the cases cited by the text writers, as we have said, in the main involve questions relating to real estate, there are two classes of cases where the equitable doctrine of constructive trusts has been applied to personalty and the proceeds followed, neither one of which, however, includes a case like the one under consideration.

*First.* Where a person, having possession of the property of another towards whom he sustains a fiduciary relation, wrongfully disposes of it.

*Second.* Where there is an absence of title in the wrongdoer *ab initio.*

The first class extends to trustees, executors and administrators, directors of corporations, guardians, committee of lunatics, agents using money of their principals, partners using partnership funds, husbands purchasing property with money belonging to their wives,

parents buying property of their children, guardians of their wards, trustees of their *cestui que trusts*, attorneys of their clients, and all persons who stand in fiduciary relations towards others. The following cases cited on this appeal are within this class : *Holmes* v. *Gilman* (138 N. Y. 369); *Knatchbull* v. *Hallett* (L. R. [13 Ch. Div.] 696). Respondent strongly urges that the case of *The Importers & Traders' Nat. Bank* v. *Peters* (123 N. Y. 272) supports this judgment.

Everett Brothers, Gibson & Co. deposited with the Exchange Bank at Norfolk, a sight draft on M. & Co., of New York city, indorsed by the drawer in the form in which by agreement and custom of the parties drafts for collection only were to be indorsed. The bank forwarded the draft to the Importers and Traders' Bank, who collected it and placed the proceeds to the credit of the Exchange Bank. Immediately thereafter the last-named bank suspended payment, the fact being that it had been hopelessly insolvent for six months to the knowledge of all the managing directors. Both the receiver of the insolvent bank and Everett Brothers, Gibson & Co. claimed the proceeds of the draft from the Importers and Traders' Bank.

The latter upon the grounds,

*First.* That the Exchange Bank was their agent only for the purpose of collecting the draft.

*Second.* That the agent had been guilty of fraud in not disclosing its insolvent condition.

The trial court found in substance the facts to be as claimed. The judgment was affirmed at General Term, and the Court of Appeals in its opinion says that there was some evidence to support the first proposition of fact and abundant evidence to support the second.

Under the rule which obtains in that court, therefore, both propositions of fact were necessarily treated as established. An express fiduciary relation between the bank and the drawer of the draft, therefore, existed. The drawer and the bank were principal and agent, not vendor and vendee.

The Exchange Bank never had title to the draft. Everett Brothers & Gibson & Co. continued to be the owners of it down to the moment of its payment, when the proceeds were substituted in its

place and the title thereto became vested in the original owner of the draft.

This case, therefore, comes under the classes already referred to. *Newton* v. *Porter* (69 N. Y. 133) is within the second class.

The plaintiff's bonds were stolen and afterwards sold by the thief, and it was held that the plaintiff could follow the proceeds received by the thief into the hands of a transferee with notice.

The title to the bonds was, of course, never in the thief, and he never acquired from the owner any right to use them as his own.

The plaintiff waived, not the theft, but the wrongful disposition of the bonds, adopting the thief's act in disposing of them as his own act, and was, therefore, permitted to follow the proceeds.

Had the plaintiff rescinded the contract before the merchandise in question was disposed of, thus restoring to itself the title to it, and thereafter Burkhalter & Co. had disposed of it before the plaintiff could regain possession, a different question would be presented.

Instead, it waited until the person having title and possession and the absolute right of disposition of the merchandise as its own property, a right conferred upon them by the plaintiff's own act, had disposed of it. Then, to obtain an advantage over the other creditors of the insolvent firm, it asked the court to spell out a constructive trust as to the property sold before rescission. A request neither supported by authority nor, as we think, by the rules governing the raising of trusts by construction of equity.

If the plaintiff's position could be sustained then it would be difficult to conceive of a case in which a vendor might not come into equity and follow the proceeds of merchandise because the original contract was tainted with fraud.

The Court of Appeals said in *Bosley* v. *N. M. Co.* (123 N. Y. 550–555): "It is not in every case of fraud that relief is to be administered in a court of equity, and it is a well-settled rule that wherever a matter respects only a sale of personal chattels, and lies merely in damages, the remedy is at law only. If this had been a sale of a horse to the plaintiff procured by fraud it would not have been proper for her to resort to an equitable action for relief, because an action at law would furnish her an ample remedy and give her all the relief to which she could, under any circumstances, be entitled."

The judgment should be reversed and a new trial granted before another referee, with costs to the appellant to abide the event.

Van Brunt, P. J., concurred.

Follett, J. (dissenting):

I am unable to concur in the proposition that in case A. is induced to sell goods to B. by the fraud of the latter, who is insolvent and purchases with a preconceived design not to pay for them, and he sells the goods to others *on credit* — negotiable paper not being given for the price — and the sale is rescinded before the subsequent purchasers pay for the goods, that the price agreed to be paid cannot be reached by the defrauded vendor.

It seems to me that the prevailing opinion rests on two erroneous assumptions: (1) That the vendees of C. Burkhalter & Co. were purchasers in good faith *and for value*. (2) That the referee ordered a general judgment against the assets in the hands of the assignee for the benefit of creditors.

The purchasers from C. Burkhalter & Co. were not purchasers for value. The referee found: "And I further find that the said sales by Burkhalter & Co. were made to their customers upon terms of credit, some of which had not expired at the time of the making of the said general assignment." This fact was stipulated on the trial, and it was stipulated that the avails of many of these credits came to the hands of the assignee. One who purchases on credit and neither parts with anything nor gives negotiable paper for the price, does not become a purchaser for value until he pays the purchase price. (Bump. Fr. Conv. [2d ed.] 483 and cases cited; Pom. Eq. Juris. § 750 *et seq.* and cases cited.)

The referee did not order a general judgment against the assets in the hands of the assignee for the benefit of creditors. He held that the assignee was liable to account to the plaintiff for "the proceeds of any of said goods and merchandise in whatsoever form such proceeds may be, and to the extent that such proceeds can be traced and identified, as may have come or may hereafter come into their possession or control." The interlocutory judgment followed the decision, and ordered an accounting of the avails of the sugars sold on credit which came into the assignee's hands. The plaintiff did not recover, nor did it seek to recover, sums not directly traceable

to the assignee's hands, and arising from the sales on credit. After the entry of the interlocutory judgment the litigants stipulated:

" II. It is further stipulated that the amount for which the said defendant, Charles H. Fancher, assignee, etc., is compellable to account to this plaintiff under the said interlocutory decree, equals in all the sum of $10,606.62, and that the amount of the final judgment to be entered against the said Charles H. Fancher thereunder, equals the said sum."

This stipulation was entered into to avoid the expense of an accounting, and upon the assumption that if the interlocutory judgment was right the plaintiff was entitled to recover that sum.

The defendant, having made this stipulation, cannot now urge the form of the judgment as a ground for reversing it. I think the interlocutory judgment was right, and that it and the final judgment should be affirmed, with costs.

Judgment reversed, new trial ordered before another referee to be appointed by the order to be entered hereon, with costs to appellant to abide event.