In the Matter of the Petition of E. H. & D. M. CAVIN, Respondents, *v.* JOHN B. GLEASON, as General Assignee, etc., Appellant.

Upon an accounting in bankruptcy or insolvency, a trust creditor is not entitled to preference over general creditors of the insolvent merely on the ground of the nature of the claim. To authorize such a preference

some specific recognized equity founded on some agreement, or relation of the debt to the assigned property must be shown, which entitles the claimant, according to equitable principles, to preferential payment.

To entitle the trust creditor to such a preference, it must at least be made to appear that the fund or property of the insolvent remaining for distribution, includes proceeds of the trust estate.

In proceedings to compel an assignee, for the benefit of creditors, to first pay the claim of petitioners out of the funds in his hands, it appeared that the petitioners just before the assignment, placed a fund in the hands of the assignor to be invested in a mortgage. Instead of doing this he used the entire fund except $30 in paying his personal debts, and soon thereafter made the assignment, the $30 coming to the hands of the assignee. *Held*, that the petitioners were only entitled to a preference to that amount.

*People* v. *City Bank of Rochester* (96 N. Y. 32), distinguished.

(Argued March 10, 1887; decided April 19, 1887.)

APPEAL from order of the General Term of the Supreme Court in the fourth judicial department made January 12, 1886, which affirmed an order of Special Term directing John B. Gleason, as assignee for the benefit of creditors of Seth H. White, to pay the petitioners out of the funds in his hands the sum of $877.27; the balance unpaid of a fund of $3,000 which was placed by them in the hands of the assignor January 3, 1883, to be invested by him for their benefit in a bond and mortgage to be given by J. P. Gould.

The further facts appear in the opinion.

*J. B. Gleason* for appellant. The petitioners must trace their property into the hands of the assignee in order to recover it. (*Scott* v. *Surman*, Willes R. 400; *Taylor* v. *Plumer*, 3 M. & S. 562.) Upon an accounting one creditor cannot claim a general lien upon the fund simply on the ground that he is a trust creditor, the property claimed must be distinguishable. (*Ferris* v. *Van Vechten*, 73 N. Y. 125; *Whitcomb* v. *Jacob*, 1 Salkeld, 160; *Trecothick* v. *Austin*, 4 Mason, 29; 2 *Kent's Comm's*, 623–624; *Kip* v. *Bk of N. Y.* 10 J. R. 63; 73 N. Y. 121; Perry on Trusts, § 128; *Butler* v. *Sprague*, 66 N Y. 392, *People* v. *Merchants' Bk.*

78 id. 271; *Newton* v. *Porter*, 69 id. 133; *Van Alen* v. *Am. Nat. Bk.* 52 N. Y. 1; *Dows* v. *Kidder*, 84 id. 121; *Pennell* v. *Deffell*, 4 De G. M. & G. 372; *Hooley* v. *Gieve*, 9 Abb. N..C. 8.) No specific appropriation of the proceeds of the Campbell contract having been made by the petitioners, equity will apply the proceeds in the way most favorable to the unsecured creditors. ( *Wright* v. *Wright*, 7 Daly 55.)

*W. H. Johnson* for respondents. A trust is created when-ever an obligation rests upon a person arising out of a confidence reposed in him to apply property faithfully and according to such confidence. (2 Bosw. 615; 4 Kent's Com. 295; 3 Blackst. Com. 431.) No particular form of words is requisite to create a trust. The court will determine the intent from the general scope of the language. (10 Johns. 496; 4 Kent's Com. 305.) Merger never occurs in equity, unless justice or intent of parties demands it. (35 N. Y. 279.) The intention of the parties is the controlling consideration when it has been made known or can be inferred from their acts or conduct. (7 Wait's Act. and Def. 324; *Campbell* v. *Carter*, 14 Ill. 286.) An agreement under seal does not merge the debt if it is given and accepted as collateral only. (7 Wait's Act. & Def. 325; *Charles* v. *Scott*, 1 S. & R. [Penn.] 276; *Butler* v. *Miller*, 1 Com. 496 ) Taking a higher security would not merge the original debt in a case where the security was intended merely as a collateral. (14 Johns. 404; 7 Cow. 662; 7 Wend. 248; 15 id. 155.) It was not necessary for the petitioners to trace the identical trust fund into the hands of the assignee to entitle them to an order directing him to pay the balance of their claim in full. ( *Van Allen* v. *Am. Nat. Bk.*, 52 N. Y. 1; 75 id. 598; 84 id. 121; 96 id. 32; 104 U. S. 303; *Dows* v. *Kidder*, 84 N. Y. 131.)

ANDREWS, J. It may properly be conceded that the $3,000 received by White from the petitioners January 3, 1883, for investment in the Gould mortgage, consti-tuted in his hands a *quasi* trust fund, which White was

bound to use for the specific purpose contemplated, and which he could not divert to any other use without committing a breach of trust.  The securities which formed the greater part of the fund were immediately convertible into money and authority in White to make such conversion was implied, but only as a means of realizing the money with which to make the mortgage loan.  The securities while in the hands of White remained the property of the petitioners, and when converted by him, their title attached to the proceeds of the converted property.  White collected the securities actually or constructively.  He collected the notes against third persons and drew the money deposited in the Delaware National Bank.  The two certificates of deposit issued by himself, amounting in the aggregate to $780, he accepted as money. It is material, to a proper understanding of the question presented, to state a few other facts which appear in the record.  White was a private banker.  On the 5th of January, 1883, two days after the transaction with the petitioners to which we have alluded, he was taken sick, and on or about the 9th of January a run commenced on the bank, and on the 12th of January he made a general assignment to the defendant, Gleason, for the benefit of creditors, having at the time on hand in cash assets only the sum of $64.75.  The Gould mortgage was never procured by White, and he made no investment for the petitioners of the $3,000 received on the 3d of January.  On the contrary it was found by the judge at Special Term that White after receiving and collecting the securities, and prior to the 11th of January, in violation of his trust, used the entire fund of $3,000, excepting the sum of $30 which came to the hands of the assignee, in paying his personal debts and liabilities.  But on the 11th of January, the day prior to the making of the assignment, for the purpose of securing the claim of the petitioners, he transferred to them a land contract, from which and other sources the petitioners have realized sufficient to reduce their claim to the sum of $877.27.  It was admitted on the hearing of the petition, which took place

in January, 1885, that the assignee had then on hand proceeds of the assigned estate sufficient to pay the said sum of $877.27, but it was conceded by the petitioners that the assigned estate was insufficient to pay in full the debts of the assignor.

The Special Term granted the prayer of the petitioners and made an order directing the assignee to pay the claim of the petitioners out of the money in his hands, and this order was affirmed by the General Term. The order in effect appropriates out of the assigned estate the sum of $877.27 to the payment of the claim of the petitioners, in preference to the claims of the general creditors. The petitioners to maintain the order in question, rely upon the rule in equity that as between *cestui que trust*, and trustee, and all parties claiming under the trustee otherwise than by purchase for a valuable consideration, without notice, all property belonging to a trust, however, much it may be changed or altered in its nature or character, and all the fruit of such property, whether in its original or altered state, continues to be subject to or affected by the trust. (*Pennell* v. *Deffell*, 4 De G.M. & G. 387; TURNER, L. J.) This settled doctrine of equity has its basis in the right of property. The owner of personal property, which by the wrongful act of his agent or trustee, has been changed and converted into chattels of another description, may elect to treat the property into which the conversion has been made, as his own. Upon such election the title to the substituted property is vested in him as fully as if he had originally authorized the wrongful act, which title he may assert in a legal action to the same extent as he could have asserted title in respect to the original property. The reason of the doctrine is stated by Lord ELLENBOROUGH in the leading case of *Taylor* v. *Plummer* (3 Maul. & S. 562), in language often quoted. "For," he says, "the product or substitute for the original thing still follows the nature of the thing itself, so long as it can be ascertained to be such, and the right only ceases when the means of ascertainment fail." The question in that case,

involved the legal title to certain stock and bullion which an agent of the defendant, intrusted by his principal with the money to invest in exchequer bills, had wrongfully misapplied to the purchase of the stock and bullion, intending to abscond with it and go to America, and the court sustained the defendant's title.   Courts go very far to protect rights of property as against a wrong-doer.   They follow it through whatever changes and transmutations it may undergo in his hands, and as against him transfer to the changed and altered product the original title, however much the original property has been increased in value by his labor or expenditure, provided only that the product is still a chattel and is composed of the original materials.   (*Sils-bury* v. *McCoon*, 3 N. Y. 379.)   But a court of law, as a general rule, deals only with the legal title, and when the legal identity of the property is destroyed, or the property cannot be traced specifically into another thing, it is powerless to give relief except by action for damages against the wrong-doer.   The language of Lord ELLENBOROUGH, already quoted, that the right to follow property only ceases when the means of ascertainment fail, is illustrated by what follows, "which," he adds, "is the case when the subject is turned into money and mixed and compounded in a general mass of the same description."   It is not important to inquire whether later decisions have not established, even in respect to strictly legal actions, a somewhat less stringent limitation upon the right of pursuit than that indicated in the language just quoted.   But it is unnecessary to pursue this inquiry here. It is clear that in this case the trust fund has been dissipated and lost by the act of the trustee.   It is neither specifically in the hands of the trustee or of his assignee, nor is it represented by other property into which it has been converted.   The fund, according to the finding, (with the exception of the sum of $30) was paid out on the debts of White before the assignment.   Plainly, there is no room for any contention that the petitioners have legal title to any of

the assigned property. The sole inquiry is, whether a case is made for equitable intervention in favor of the petitioners, in the administration of the insolvent estate. It is clear, we think, that upon an accounting in bankruptcy or insolvency, a trust creditor is not entitled to a preference over general creditors of the insolvent, merely on the ground of the nature of his claim, that is, that he is a trust creditor as distinguished from a general creditor. We know of no authority for such a contention. The equitable doctrine that as between creditors equality is equity, admits, so far as we know, of no exception founded on the greater supposed sacredness of one debt, or that it arose out of a violation of duty, or that its loss involves greater apparent hardship in one case than another, unless it appears in addition that there is some specific recognized equity founded on some agreement, or the relation of the debt to the assigned property, which entitles the claimant, according to equitable principles, to preferential payment. If it appears that trust property specifically belonging to the trust is included in the assets, the court, doubtless, may order it to be restored to the trust. So, also if it appears that trust property has been wrongfully converted by the trustee, and constitutes, although in a changed form, a part of the assets, it would seem to be equitable, and in accordance with equitable principles that the things into which the trust property has been changed should, if required, be set apart for the trust, or if separation is impossible, that priority of lien should be adjudged in favor of the trust estate for the value of the trust property, or funds, or proceeds of the trust property, entering into and constituting a part of the assets. This rule simply asserts the right of the true owner to his own property. But it is the general rule as well in a court of equity as in a court of law, that in order to follow trust funds and subject them to the operation of the trust, they must be identified. A court of equity in pursuing the inquiry and in administering relief, is less hampered by technical difficulties than a court of law, and it may be sufficient to entitle a party to equitable preference in the distribution of a fund in insol-

vency, that it appears that the fund or property of the insolvent remaining for distribution, includes the proceeds of the trust estate, although it may be impossible to point out the precise thing in which the trust fund has been invested, or the precise time when the conversion took place. The authorities require, at least, this degree of distinctness in the proof, before preference can be awarded. (*See Van Allen* v. *American Nat. Bk.* 52 N. Y. 1; *Newton* v. *Porter*, 69 id. 133; *Ferris* v. *Van Vechten*, 73 id. 113; *Pennell* v. *Deffell*, *supra*; *Fish* v. *Courtland*, 2 Hem. &. M. 417.) The facts in this case fall short of the proof required within any case which has come to our notice. The trust fund, with the single exception mentioned was misappropriated by White to the payment of his private debts prior to the assignment. It cannot be traced into the property in the hands of the assignee, for the plain reason that it is shown to have gone to the creditors of White in satisfaction of their debts. The courts below seem to have proceeded upon a supposed equity springing from the circumstance that by the applica· tion of the fund to the payment of White's creditors the assigned estate was relieved *pro tanto* from debts which otherwise would have been charged upon it, and that thereby the remaining creditors, if entitled to distribution, without regard to the petitioner's claim, will be benefited. We think this is quite too vague an equity for judicial cognizance, and we find no case justifying relief upon such a circumstance. In a very general sense all creditors of an insolvent may be supposed to have contributed to the assets which constitute the residuum of his estate. The case of *People* v. *City Bank of Roches-ter* (96 N. Y. 32) seems to have been misunderstood. The question considered in this case was not raised there, and it was not claimed in that case that the proceeds of the checks of Sartwell, Hough & Co., the petitioners, had not gone into the general funds of the bank, or that they had not passed in some form to the receiver. The court did not decide that the petitioners would have been entitled to a preference in case the proceeds of the check had been

used by the bank, and were not represented in its assets in the hands of the receiver.

For the reasons stated we are of opinion that the orders of the Special and General Terms should be modified by reducing the sum directed to be paid by the assignee, to the sum of $30, with interest from April 19, 1883, but without costs to either party.

All concur.

Ordered accordingly.