In the Matter of the Judicial Settlement of the Accounts of CHARLES BRENNEMAN, as Surviving Executor, etc., of FREDERICK LEONHARD, Deceased.

CHARLES BRENNEMAN, as Executor, etc., Appellant; MARY E. SIDE and Others, Respondents.

*Misapplied trust funds — claiming the property in which they are invested — jurisdiction of the Surrogate's Court.*

Where a trust fund has been misapplied the beneficiary may follow it and may reclaim it in whatever form it has been invested by the trustee, provided the rights of *bona fide* purchasers do not intervene.

The beneficiary's right to reclaim from an executor misappropriated moneys belonging to an estate is not affected by the fact that the executor has substituted other money for such money or exchanged it for other property, and this right can be enforced against property which the wrongdoer has obtained in exchange therefor, provided the beneficiary elects to take it in the shape into which it has been converted.

Where a trustee in the purchase of property uses his own money and that of his *cestuis que trust* jointly in the payment therefor, if the *cestuis que trust* so elect they will become co-owners of the property in the proportion which the contributions from the trust fund and the personal moneys of the trustee bear to the sum total invested.

The Surrogate's Court has jurisdiction to compel an executor or trustee to account for real estate in which the moneys of the estate have been invested, if the facts surrounding it are such that it may be treated as personalty, and can compel an accounting of such real estate as a part of the assets of the estate.

APPEAL by Charles Brenneman, as surviving executor, etc., of Frederick Leonhard, deceased, from portions of a decree of the Surrogate's Court of the county of New York, entered in said Surrogate's Court on the 14th day of November, 1894, passing his accounts as such executor.

Frederick Leonhard died July 3, 1873, leaving a last will and testament, wherein, after giving certain legacies to his children, Elizabeth Brenneman, Joseph and Augustus Leonhard, and directing that the payment of his debts should be provided for, he provided as follows:

" *Thirdly.* All the rest, residue and remainder of my estate, both real and personal, I give, devise and bequeath unto my wife, Mar-

garet Leonhard, to have and to hold the same for and during her natural life.

"*Fourthly.* After the decease of my said wife I give, devise and bequeath unto my said three children all the said rest, residue and remainder of my said real and personal estate, share and share alike, to have and to hold the same to them, their heirs and their assigns forever. * * *

"*Lastly.* I nominate and appoint my son Joseph F. Leonhard and my son-in-law, Charles Brenneman, executors of this my last will and testament."

Charles Brenneman duly qualified as executor, and letters were issued to him as such on August 20, 1873, and he has continued to act as such executor down to the present time.

Margaret Leonhard, the testator's wife, died on the 24th day of July, 1891. All of the persons interested in the estate have waived all claim against the accounting executor, except Mary E. Side, Frederick Leonhard, Josephine Leonhard and Edward Leonhard, who are each entitled to one-eighteenth of the residuary estate.

The referee found, among other things, that the executor collected the sum of $768.13, interest upon mortgages which had accrued prior to the death of the testator, viz., July 3, 1873, and has not charged himself with the same as principal in Schedule "A" of his account as amended.

That the executor, when he received the moneys of the estate, deposited them in a bank account in his individual name, wherein were deposited moneys belonging to himself, and that he mingled the moneys of this estate with his own.

That prior to the death of the testator, and about June, 1873, Charles Brenneman, the executor herein, had formed a quasi partnership with Frederick Folz and Frank Heerlein for the purchase of land and the erection of buildings thereon.

That the partnership thus formed continued down to and about the 16th day of March, 1875.

That between June, 1873, and the close of the partnership, March 16, 1875, Charles Brenneman, the executor herein, paid into the partnership the sum of $120,224.07, and received therefrom during said time the sum of $91,035.71, an excess of payments over receipts of $29,188.36.

That Charles Brenneman, the executor herein, drew from the account where the moneys of this estate were deposited and mingled with his own moneys the sums paid into the partnership between September, 1873, and March 16, 1875.

That of the moneys paid into the said partnership by Charles Brenneman between September, 1873, and March 16, 1875, the date of the partnership settlement, $12,388.71 were moneys of the estate of Frederick Leonhard, deceased, and formed part of the $29,188.36 which said Brenneman had invested at the close of the partnership, March 16, 1875.

That at the close of the partnership business, March 16, 1875, Charles Brenneman, the executor herein, received, subject to mortgages amounting to $42,000, the property situated at the southwest corner of Mott and Houston streets, being about sixty-three feet four inches wide on Houston street by seventy-six feet one-half inch on Mott street, as and for the moneys invested and his share of the profits of said partnership.

That the executor collected $704.50 rent per month on the said property at Houston and Mott streets, between July 24, 1891, and August 23, 1892, amounting in the aggregate to $9,158.50.

That the executor herein paid taxes on the said property at Houston and Mott streets, between July 24, 1891, and August 23, 1892, amounting to $866.67.

That the executor herein paid interest on mortgages on said property at Houston and Mott streets between July 24, 1891, and August 23, 1892, amounting to $2,394.17.

The referee reported, as a conclusion of law, so far as the interest of Mary E. Side, Frederick Leonhard, Josephine Leonhard and Edward Leonhard are concerned, as follows :

That the executor should be charged with the interest on mortgages collected by him, which interest had accrued prior to the testator's death, aggregating $768.13.

That the executor should be charged with $\frac{1238871}{2918836}$ of the property situated at the southwest corner of Mott and Houston streets, being about sixty-three feet four inches wide on Houston street by seventy-six feet one-half inch on Mott street, as an asset of the estate, subject, however, to the mortgages thereon, amounting to $42,000.

That the executor should be charged with the sum of $\frac{12388.71}{2918836}$ of $9,158.50, rents collected on the Houston and Mott street property, between July 24, 1891, the date of the death of the life tenant, and August 23, 1892, viz., $3,886.24.

That the executor should be credited with the taxes paid on the Houston and Mott street property between July 24, 1891, and August 23, 1892, to wit, $866.67.

That the executor should be credited with the interest on the mortgages paid on the Houston and Mott street property between July 24, 1891, and August 23, 1892, to wit, $2,394.17, leaving a balance in the hands of the executor of $11,877.93 in cash, and $\frac{12388.71}{2918836}$ of the Houston and Mott street property, subject to the mortgages of $42,000, of which balance the contestants are entitled as follows: Mary E. Side, one-eighteenth; Edward Leonhard, one-eighteenth; Josephine Leonhard, one-eighteenth; Frederick Leonhard, one-eighteenth.

*Howard Y. Stillman*, for executor, appellant.

*Henry A. Forster*, for the respondents.

PARKER, J.:

The question to be considered relates to the findings that the executor is chargeable with $\frac{12388.71}{2918836}$ of the property at the southwest corner of Houston and Mott streets.

In May, 1873, the executor entered into a partnership with Frederick Folz and Frederick Heerlein to buy, improve and sell real estate. The partnership continued until March 16, 1875, when it was dissolved and the assets were divided, the executor receiving as his share of the assets the three houses on the southwest corner of Houston and Mott streets.

The executor invested from $26,000 to $29,000 in the partnership, his partners testifying that the former was the correct amount, and the executor the latter, and the referee found the fact to be as testified to by the executor. Of this amount, the contestants claimed that about $15,000 was the money of the estate, but the referee has found that the true sum was $12,388.71.

One of the difficulties which confronted the contestants, in their

effort to ascertain the amount, was due to the fact that the executor did not keep a separate account with the funds of the estate. All receipts, whether of moneys of the estate or his own personal funds, were deposited to his individual credit and drawn out by checks as demands were made upon him by parties interested in the estate, or by his own creditors or for business ventures.

There was no difficulty whatever in determining the sum for which he should account, but as the executor was insolvent, the contestants deemed it essential, if the accounting was to result in any practical benefit to them, to trace such of the funds into the real estate venture as were actually put into it. Even the Houston and Mott street houses were by the executor conveyed to his father and the life tenant in 1876. Another reason, doubtless, was to secure a portion of the profits resulting from the real estate investment between the time of the death of the life tenant and the institution of this proceeding for an accounting.

Between the time of the testator's death and the termination of the real estate partnership in 1875, the executor received sums of money from various sources aggregating $25,618.13, and he paid out for legacies, debts of testator and in satisfaction of liens $10,606.79, thus leaving in his hands $15,011.34.

That the executor was either unwilling or unable to assist the contestants in their inquiry as to the disposition which he had made of this unaccounted for balance clearly appears from the following extract from his testimony : " Q. Your balance of January, 1875, according to your account, should have been $12,211.21. From your check book the balance is shown to be $1,220.61, leaving a balance of over eleven thousand dollars estate money used. In December, can you tell me where that money was? A. No doubt loaned it. Q. You can't tell me the loans or the amounts? A. I could not. Q. Now, in July, 1875, you should have had a bank balance according to your own statement and your own account of $14,871.76. Your bank balance in both banks, the German Exchange and the Germania, shows a balance of $1,960.37, or $12,911.50 of the estate money used by you. Can you tell me where that money was at that time? A. I cannot. * * * Q. From your accounts you owed to this estate $15,821.87, and your bank balance on that day shows $746.77, showing over $15,000 or

First Department, April Term, 1895.          [Vol. 86.

$15,075.10 of the estate money that was used by you. Can you tell me where the money was on that date? A. I could not. * * * Q. Now, in March, 1876, March 8th, * * * where then was this money? A. I could not tell you. I don't know. Q. Is that the best answer you can give me in regard to that? A. It is so long I can't tell you what I did with it. Q. You had no bank account at that time? A. No. Q. Savings or business bank account? A. No. Q. You had no securities of any description in March, 1876? A. No, sir. * * * "

The Referee: " Let him tell me what he did on May, 1876, with the estate? A. I don't remember that."

He further testified that the properties conveyed by him in 1876 to his father and the life tenant represented all the property that he held of any kind or description at that time.

The effect of the testimony to which we have referred was to negative at least the possibility of its investment in anything else than the partnership houses. As the contestants were necessarily largely dependent upon the testimony of the executor to show that the moneys of the estate were invested in this property, resort was had to his examination on proceedings supplementary to execution in the year 1876, with the following result : " Q. Now, on the prior examination in this proceeding, was this question put to you as having been put to you on an examination in supplementary proceedings, and did you give this answer? Q. *What did you do with the money ?* A. *I put it where it belonged.* Q. Did you give that testimony? I suppose so. * * * Q. Was this question asked you at that time; *where was that?* A. *The estate of Frederick Leonhard.* Q. Did you give that testimony? A. I suppose it must be true ; yes, I said that. Q. Was this question asked you in the prior examination in this matter? *Was that testimony true ; is that the fact that the money belonged to the estate of Frederick Leonhard ?* A. If I said so it must be so. Q. It is so, isn't it? A. Yes; that is right. Q. On the prior examination in this matter, was this question put to you as from the supplementary proceedings ; was this question put to you in that examination and did you give this answer? Q. How did you get it from there? A. I had misappropriated funds of the estate which came into my hands as executor, and had used them to build houses in Hester, Essex and

Houston streets.   Q. Was that question asked and did you give that answer ?   A. I don't recollect any more; I suppose it was so if it is there.   Q. Are the statements made in that answer 'true ?   A. I suppose they are.   Q. They are true, aren't they ?   A. I think so ; yes, I stated that.   *   *   *   Q. The houses at Houston and Mott were conveyed to you to represent your share in the partnership , property ?   A. Yes, sir.   Q. Both money invested and profits, if any ?   A. Yes.   Q. They still stand in your name ?   A. Yes, sir. Q. And have never been out of it, except during the times they were conveyed, as you have testified to Mrs. Leonhard and your father ?   A. Yes."   " Q. It was afterwards retransferred to you ? A. Yes, sir.   Q. And whatever it was transferred to him for was canceled ?   A. There was a running account between us."

It would far exceed the proper limits of this discussion to attempt anything like a review of the testimony in this voluminous record so far as it bears upon the present question, but what we have quoted sufficiently indicates that the referee and the surrogate as well, who confirmed his report and entered a decree thereon, were justified in the conclusion reached, that a sum exceeding $12,000 in money of the estate was invested by the executor in the real estate ventures with his partners Folz and Heerlein.   The executor was not idle in his efforts to create the impression in the mind of the referee that the money was not invested in the real estate, and from his standpoint there was occasion for activity, for the profits resulting from the real estate during the period which lasted between the time of the death of the life tenant and the commencement of the accounting were far greater than the legal rate of interest which otherwise would be charged.   Again, he was quite likely not without hope that a decree which should merely adjudge that he had a certain amount of money in his hands belonging to the estate, out of which he should pay over to the contestants four-eighteenths, would result less seriously, than one which should adjudicate that in a particular piece of valuable property, still remaining in the family, the moneys of the estate were invested, and that such moneys and the interest which they purchased constituted assets of the estate.   With that end in view he produced two books of account which he claimed contained the items of account between himself and his partners Folz and Heerlein.   They did show cer-

tain payments and receipts of moneys during the years 1873, 1874 and 1875, but did not furnish evidence as to the source from which the principal amount of moneys came, which were invested in the real estate partnership. The accuracy of the books did not pass unchallenged. Folz and Heerlein testified that the basis upon which they made a settlement with the executor was entirely different from that shown by the books; the first book also bore evidence of mutilation, some thirty-four pages being missing; the tops of several of the pages were off and appeared to have been cut off, and they were open to criticism of a character tending strongly towards justifying the referee in regarding the testimony of the executor on the other examinations, to which we have referred, as not being overborne, to say the least, by the books.

Our conclusion being that the evidence justified the finding of fact made, we come now to the questions of law involved.

It is a general rule where a trust fund has been misapplied, that the beneficiary may follow it so long as it can be traced, until the rights of a *bona fide* purchaser intervene, and may reclaim it in whatever form it has been invested by the trustee. (*Newton* v. *Porter*, 69 N. Y. 133; *Holmes* v. *Gilman*, 138 id. 369.)

The beneficiary's right to reclaim misappropriated estate moneys from an executor is not affected by the fact that the executor has substituted other money for it, or exchanged it for other property. (*Van Alen* v. *American Natl. Bank*, 52 N. Y. 1; *Baker* v. *N. Y. Natl. Ex. Bank*, 100 id. 31.)

This right can be enforced against property which the wrongdoer has obtained in exchange, provided the beneficiary elects to take it in the shape into which it has been converted. (*Matter of Cavin* v. *Gleason*, 105 N. Y. 260.) Where trust moneys can be followed into the lands, to the purchase of which they have been applied, the *cestui que trust* may elect whether to hold the unfaithful trustee personally responsible, or claim the lands. (*Ferris* v. *Van Vechten*, 73 N. Y. 113.)

And if a trustee in the purchase of property uses his own money and that of his *cestuis que trust* in payment, if the *cestuis que trust* so elect they will become co-owners of the property in the proportion which the contributions from the trust fund and the personal

moneys of the trustee bear to the sum total invested.    (*Holmes* v. *Gilman*, 138 N. Y. 369–378.)

The principle enunciated by the several cases to which we have referred are applicable to the facts of this case, but they were applied by a court having general jurisdiction in equity, whereas the Surrogate's Court has not such jurisdiction, and this brings us to the question whether the Surrogate's Court had jurisdiction to compel the executor to account for lands in which he had invested the funds of the estate.    The Surrogate's Court has such jurisdiction only as is given it by statute, which governs it in proceedings for an accounting, and for the disposition of the assets of the decedent, and where the aid of a court of equity is required to impose a trust the Surrogate's Court cannot declare and direct the execution of it in advance of the making of a decree of a court of general jurisdiction establishing it.    But this does not prevent the Surrogate's Court from compelling an executor or trustee to account for real estate in which the moneys of the estate have been invested, if the facts surrounding it are such that it may be treated as personalty, and compelling an accounting of it as a part of the assets of the estate.    Such a situation has illustration in Redfield on Surrogates' Courts (5th ed.), 425.    "Land bought in by executors, on a foreclosure of a mortgage belonging to the estate, is to be treated as personal property, and a Surrogate's Court has jurisdiction to direct an accounting in respect thereto, where the administrator, through a mesne conveyance, has acquired title in his individual name.    It is not necessary to first proceed in equity for the imposition and declaration of a trust."

In *In re Gilbert* (39 Hun, 61) an administrator purchased land on foreclosure by crediting the amount of the purchase price on a mortgage belonging to the estate, conveyed the land to his son for a nominal consideration and took a reconveyance from his son on a nominal consideration, and it was held that the Surrogate's Court had jurisdiction to compel him to account for it and would treat it as personal estate.

In the course of the discussion had the court said : " The administrators as such took the title as purchasers on the mortgage foreclosure sale, and without any consideration paid, they, through his

son, placed the title in the appellant. In the hands of the administrators the property had the character of personalty, and the handing it over to one of them, unembarrassed with any other facts, would seem to continue its character and relation to the estate represented, of which it might be treated as assets for the purpose of accounting. * * * We are inclined to think that upon that state of facts the surrogate had jurisdiction of the proceeding."

The discussion in *Lockman* v. *Reilly* (95 N. Y. 64) is in point: " It may happen that an executor or administrator, without authority, invests the funds of the decedent's estate in land; or he may take land in payment of a debt due to the estate which he represents, or may purchase it for the protection of the estate. * * * Under such circumstances the executor or administrator in one sense holds the land in trust for the persons beneficially interested in the estate, and can be compelled to account for it. * * * The legal title to the land is in the executor or administrator, but, as between him and the legatees, next of kin and creditors, * * * it is personal estate, and he holds it as the legal representative of the deceased. * * * It was not made as a purchase of land * * * under a power contained in the will, for there was no power in the will to invest in land. * * * The effect of the conveyance to the executrix was to make the land in her hands take the place of the mortgage as personal estate; and she was liable to account for it as such. * * * The beneficiaries * * * only had the right to require the executors to account for it as for any other item of personal estate in her hands as executrix. * * * That land bought in by executors on a foreclosure of a mortgage belonging to the estate is to be treated as personal property, which the executors may sell, and for which they are accountable as such, has been frequently decided, and it is immaterial whether the deed is taken in the names of the executors as such or in their individual names. * * * The beneficiaries under the will * * * never had any interest in it as land. It was personalty when the testator died, and, so far as their rights are concerned, it still remained personalty in the hands of the executrix."

These cases seem to be authority for the proposition that the Surrogate's Court, in a situation such as is presented by this record,

could treat the lands, into which the moneys of the estate went, as personalty and compel the executor to account therefor.

And the decree certainly does not transcend the rule which they establish, as will be observed from a reading of the provisions of the decree bearing upon that subject. They read as follows : " The said executor is also charged with $\frac{12388.71}{29188.36}$ of the property situated at the southwest corner of Houston and Mott streets, in the city of New York, being about 63 feet 4 inches wide on Houston street by 76 feet $\frac{1}{2}$ inch on Mott street, subject, however, to the mortgages thereon, amounting to $42,000. * * * And it is further ordered, adjudged and decreed that $12,388.71 of the $29,188.36 invested by the executor in the property at the southwest corner of Houston and Mott streets, being about 63 feet 4 inches wide on Houston street by 73 feet $\frac{1}{2}$ inch on Mott street, was money of the estate of Frederick Leonhard, deceased; that the executor is charged with $\frac{12388.71}{29188.36}$ of said property as an asset of the estate, subject, however, to mortgages thereon amounting to $42,000." Of this interest the decree adjudges that each one of the four parties in whose behalf the contest was made is entitled to a one-eighteenth part thereof. While the Surrogate's Court had undoubted authority under the facts in this case to decree as it did, a practical difficulty may confront the successful contestants as to the manner in which, if at all, its provisions may be enforced for their benefit. But with that question we have no concern on this review, for we have only to consider whether the decree violates any of the legal rights of the executor.

The decree should be affirmed, with costs.

VAN BRUNT, P. J., and O'BRIEN, J., concurred.

Decree affirmed, with costs.