## FLORENCE G. COLLINS

*v.*

### JAMES L. STEUART.

[Filed October 4th, 1899.]

1. An assignment to the wife of a decedent of securities standing in his name was found after decedent's death. The assignment stated that it was made to protect his wife from loss of bonds he had borrowed from her with which to raise money, and was signed by one witness, who testified that in executing the paper decedent told him he was about to use some of his wife's securities to obtain money, and in order to save her from possible loss, was settling over to her certain securities of her own.—*Held*, that the document should be sustained as a declaration of trust.

2. Where a declaration of trust, executed by a decedent and found among his papers, had been amended by him after its execution, by the substitution of different securities, it is to be presumed that the intention was that the declaration should be operative as amended.

3. The fact that an insolvent decedent had made a declaration of trust covering certain securities, to protect his wife from loss of bonds belonging to her, used by him to raise money, does not, in case such securities are insufficient to cover her loss, give the wife a preference in the distribution of the general assets over other creditors, where it is not shown that the assets include the identical money raised by decedent on bonds belonging to his wife.

On bill, &c.

.Collins v. Steuart.

*Mr. William M. Seufert* and *Mr. Washington B. Williams*, for the complainant.

*Mr. David D. Zabriskie* and *Mr. William R. Barricklo*, for the defendant.

Stevens, V. C.

On July 5th, 1883, the complainant, Florence G. Collins, was married to Walter S. Collins. She was then possessed of property consisting of bonds and other securities held for her by her mother, Mrs. Gaston. On March 7th, 1884, Mrs. Gaston handed to Walter S. Collins securities to the amount of $16,600, and took from him an acknowledgment that he received them for his wife. Among them were seven bonds of the Chicago, Milwaukee and St. Paul Railroad Company, six of which, on March 7th, 1888, he deposited with the First National Bank of Staten Island, to secure his note for $5,500. On March 13th, 1889, he borrowed an additional sum from the same bank, gave a new note for $6,500 and deposited the remaining bond as further security therefor. He continued to pay interest on the note up to the time of his death, which occurred on December 5th, 1893.

On March 14th, 1889, that is, one day after he had pledged the last bond, he executed a paper, in form, an assignment of certain stocks which he then owned, in the presence of John W. Loveland, his wife's cousin. This assignment, after stating that in consideration of the loan to him by his wife Florence of the bonds in question (a statement not true in point of fact), he had pledged them as security for his note, proceeds as follows:

" I hereby assign and set over to said Florence G. Collins, her heirs and .assigns, the following property now standing in my name, to secure her from loss in case said bonds should be forfeited by the non-payment of my said note, as therein provided, viz. [mentioning certain stocks of industrial companies], the certificates for same being hereto attached, and I authorize the ·proper persons to make the transfer of said shares on the happening of the .contingency herein stated.

" Witness my hand and seal this 14th day of March, A. D. 1889.

·  " Witness—John W. Loveland.               W. S. Collins." [Seal.]

Collins v. Steuart.

This paper was found at his death in a tin box in which were contained securities, some of which belonged to Mr. Collins and some of which belonged to his wife. It was not in the condition in which it was when executed. Collins had, between the time of its execution and the time of his death, drawn lines through the names and amounts of some of the stocks specified, and written in, in red ink, the names and amounts of others. On the left-hand side of the paper he had written as follows: "Amended in red ink, 22 Sept. /92 W. S. C." The par value of the stocks in the paper, as amended, was $10,600. Mr. Loveland, who took the paper out of the tin box, a few days after his death, thinks that the stocks enumerated in it, as it then stood, were, with a single exception, attached to it. Collins' estate is insolvent, and the question is whether the above paper has legal force, either as an assignment or as a declaration of trust. I have come to the conclusion, after some hesitation, that it is capable of being sustained as a declaration of trust.

The question of what amounts to such a declaration has been recently before the court of appeals in *Janes* v. *Falk, 5 Dick. Ch. Rep. 468.* It was said in that case that it is not essential that the memorandum relied upon should have been *delivered* to any one as a declaration of trust or that the *cestui que trust* should have been informed of the trust. It has often been held in other cases that it is not necessary that the word "trust" should be used by the declarant. Such being the law, it seems to me that there is enough here to show that Collins declared a trust at the time the paper was first executed. What he did was this: He, in terms, *assigned and set over*, using words *de præsenti*, certain stock standing in his name. This, assuming that the paper took effect immediately, vested in his wife not a legal title but only an equitable interest. Passing by the objection that he could not directly convey to his wife, numerous cases show that the legal title to shares of capital stock does not pass by formal assignment merely. The legal title, therefore, in any event, remained in Collins himself. But did Collins so intend? If he did, then we have what amounts to a declaration of trust—that is, a declaration showing that the declarant holds

the legal title for the benefit of another person, to whom he thereby transfers the equitable interest, and the case is distinguishable from such precedents as *Milroy* v. *Lord, 4 DeG., F. & J. 264,* and *Richards* v. *Delbridge, L. R. 18 Eq. 11.* I think Collins did so intend, for in the paper itself he further provides that the proper persons are to make the transfer " on the happening of the contingency herein stated." This contingency is the forfeiture of the bonds by non-payment of the note. So he is to hold the legal title until such forfeiture. As the forfeiture did not occur in his lifetime, he, up to the time of his death, held the legal title in strict accordance with the terms of the instrument.

If, however, complainant's case rested on the paper alone, I should doubt very much whether it would be maintainable for another reason. There would be an entire failure of proof that he intended the paper to become operative. It would be a dangerous thing to give effect to a deed or other instrument found in the possession of the man who had signed and sealed it or had even acknowledged it before a commissioner, without proof of delivery or of something equivalent to delivery. The evidence of Loveland appears to supply the needed proof. He says that at the time he witnessed the paper Collins said to him :

"I am about to use some securities of Mrs. Collins for the purpose of obtaining money, and in order to save her from possible loss in case of forfeiture for non-payment, I am here setting over to her certain securities of her own, and I wish you to witness this paper as a pledge of those securities."

The securities were at the time, according to Loveland's recollection, attached to the paper. This evidence shows that Collins intended the declaration to be operative from the time of its execution. The following cases are illustrations of how this subject has been dealt with, under a somewhat ·similar state of facts. *Ex parte Pye, 18 Ves. 140, 150* ; *Richardson* v. *Richardson, L. R. 3 Eq. 686* ; *Morgan* v. *Malleson, L. R. 10 Eq. 475* ; *Baddely* v. *Baddely, 9 Ch. Div. 113* ; *Fox* v. *Hawks, 13 Ch. Div. 822* ; *In re Smith's Estate, 144 Pa. St. 428.*

The question then arises, how far is this declaration now

operative? Some, but not all, of the stock was taken from the trust and other stock substituted in its place. I think the trust attaches to the substituted stock. As the paper was to become immediately operative in the first instance, we may reasonably accept as true Collins' written declaration, made subsequently, that he intended to " amend " it only, not to nullify it, by substituting other stocks for those taken. If he intended it to become operative in the first instance it may be safely presumed that he likewise intended it to continue operative as changed; and this presumption will be the more readily made as we are dealing with a transaction based on valuable consideration and not with a case of gift.

It is contended that the whole estate is liable to make good any loss complainant may suffer if the collateral should prove to be insufficient, before it can be applied to pay the claims of general creditors. There is nothing to show that the money which Collins obtained from the discount of his notes went into his estate, or that it now, in a changed form, constitutes part of the estate. He may have paid his debts with it, lost it or used it to maintain his family. No attempt was made to trace the money into the property of the deceased. Under these circumstances the complainant has no prior right to payment. *Matter of Cavin* v. *Gleason, 105 N. Y. 256.*