MINNA A. LEWERY, Respondent, *v.* WILLIAM J. SIMPSON and FREDERICK B. SIMPSON, Individually and as Executors, etc., of WILLIAM SIMPSON, Deceased, Appellants, Impleaded with EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Defendant.

First Department, April 29, 1921.

Fraud — suit to set aside alleged assignment by plaintiff to her uncle of insurance policy on her life and subsequent assignment thereof by his executors to themselves — evidence establishing fraud on part of assignee — plaintiff entitled to return of policy on satisfaction of amount payable to insurance company — interest should not be allowed on value of policy from date of alleged fraud to date of trial — judgment against executors for amount payable to insurance company — executors not directed to pay said sum to insurance company where estate insolvent — satisfaction of judgment on accounting of executors in Surrogate's Court — plaintiff a general creditor.

In a suit to set aside an assignment made by the plaintiff to her uncle of an insurance policy upon her life, and also an assignment of the same policy after the death of the uncle executed by the defendants, his sons, as executors, to themselves, it appeared that the uncle procured the issuance of the policy to the plaintiff in consideration of her agreement to live in his family and agreed to pay the premiums thereon while living and at his death to make provision therefor; that thereafter the uncle, upon plaintiff's marriage, told her that she would have to pay the premiums but on her inability to do so procured the alleged assignment of the policy from her under promise to protect her interests and without

any consideration; that it was not until more than three years later that the plaintiff fully understood that she had made an assignment and then for the first time learned that her uncle had appropriated said policy to his own use.

*Held*, on all the evidence, that the plaintiff is entitled to the return of her policy upon satisfaction of the amount payable to the insurance company for loans made thereon;

That the plaintiff should not be allowed interest on the value of the policy from the date of the alleged fraud of the uncle in procuring the assignment to the date of the trial;

That the plaintiff should have judgment against the defendant executors for the amount payable to the insurance company with interest less premium payments made by them, and that interest should be allowed on such payments.

But the executors should not be directed to pay the aforesaid sum to the insurance company, since it is alleged in the complaint and not denied in the answer that the estate of the uncle is insolvent, and, hence, such a direction would result in preferring the plaintiff's claim over those of other creditors.

Plaintiff is merely entitled to a judgment against the executors, which judgment can be taken care of on their accounting in the Surrogate's Court.

Since it does not appear that the funds realized from the policy can be sufficiently identified or traced, the plaintiff occupies the position of a general creditor.

APPEAL by the defendants, William J. Simpson and another, individually and as executors, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 23d day of December, 1920, upon the decision of the court rendered after a trial at the New York Special Term.

*Henry L. Sherman* of counsel [*William W. Buckley* and *Harry F. Mela* with him on the brief; *C. P. & W. W. Buckley*, attorneys], for the appellants.

*Herbert D. Cohen*, for the respondent.

MERRELL, J.:

This action is in equity to set aside an assignment made by the plaintiff to William Simpson, deceased, of a life insurance policy upon plaintiff's life and also an assignment of the same policy after the death of said assignee, executed by the defendants William J. Simpson and Frederick B. Simpson,

as executors of his last will and testament, to themselves. The complaint prays that the defendants be required to deliver the policy in question to the plaintiff free and clear of incumbrances, and for such other relief as may be just.

The so-called " policy " was, in fact, a contract by the defendant Equitable Life Assurance Society of the United States to deliver to the plaintiff on February 3, 1925, a registered gold bond for $20,000 upon payment by plaintiff of the consideration and upon the terms and conditions in said contract provided. Throughout the various transactions between the parties and in the papers said contract is referred to as a policy of life insurance, and in this opinion I will adhere to such designation of the parties. The assignment of the plaintiff to said William Simpson was made on January 27, 1913.

The judgment appealed from decrees that said assignment be set aside and declared null and void and of no effect, except in so far as the interest of the defendant Equitable Life Assurance Society of the United States is affected; that the said assignment made by the defendant executors of said decedent to themselves and which was dated March 22, 1917, be also set aside and declared null and void and of no effect, except as to the interest of said defendant assurance society; that said decree is made without prejudice to the right of the Equitable Life Assurance Society of the United States to hold said policy and assignments as collateral security until the repayment to it of loans and advancements amounting to the sum of $13,934.36 and interest, if any, and that upon repayment of said loan said assurance society deliver the policy to the plaintiff. The judgment appealed from further directs that the defendants William J. Simpson and Frederick B. Simpson, as such executors, account to plaintiff for said policy and the proceeds thereof, and that said executors, within thirty days after service upon their attorneys of a copy of said decree and notice of entry thereof, clear said policy of the aforesaid incumbrance of $13,934.36 and interest, with the exception of the sum of $2,865.89 found by the court to be due the said defendant executors as a credit against the plaintiff, and that for the purpose of satisfying and paying said lien the aforesaid defendant executors pay to said assur-

ance society the balance, amounting to the sum of $11,068.47 and interest, and that the plaintiff also recover of said defendant executors the sum of $253.94, costs of the action.

The complaint is in fraud and charges the decedent, William Simpson, with fraudulently and through and by means of deceit and fraudulent promises and representations made by him to the plaintiff, obtaining the aforesaid assignment of said life insurance policy for $20,000 on plaintiff's life. The complaint also contains an allegation that said William Simpson wrongfully converted the policy to his own use. The plaintiff, in her complaint, alleges that the defendants William J. Simpson and Frederick B. Simpson, as such executors and individually, have wrongfully taken and converted said policy to their own use.

The appellants contend that the decree is unsupported by the evidence, and that there was presented upon the trial no evidence of fraud on the part of the decedent, and that when the assignment of said life insurance policy was delivered by the plaintiff to decedent, it was done with full knowledge of the facts, and not by reason of the perpetration of any fraud by the decedent upon the plaintiff. The appellants further contend that, in case the court should find evidence of fraud sufficient to sustain the decision of the trial court, in such event the judgment appealed from must be modified by striking therefrom the sum of $3,063.31, found to be due the plaintiff from the defendant executors for interest on the value of the policy from January 22, 1913, to November 26, 1920. The paid-up value of the policy, as found by the court, on February 3, 1913, was $6,520. If the appellants are right in the last contention, the total credits to the appellants should be the sum of $5,929.20, if the appellants are to be credited with the interest which they have paid to the Equitable Life Assurance Society of the United States on the loans made by such society.

The plaintiff, Minna A. Lewery, was a niece of the wife of said decedent, plaintiff's mother being a sister of decedent's wife. Plaintiff's maiden name was Minna Albina Allen. In 1904 the plaintiff, who was then in boarding school, was a young girl of fifteen or sixteen years of age. She had an older sister, Ruby Elizabeth Allen, who, at the time of the

trial, had married and became Ruby Allen Carman. The decedent was a resident of the borough of The Bronx, owning and maintaining there a pretentious home and employing several servants. In February, 1903, the wife of the decedent became seriously ill and, at the earnest solicitation of decedent, plaintiff's sister, Ruby, went to live in his family, taking general charge of the household affairs. Theretofore, both plaintiff and her sister had been frequent visitors at the Simpson home, and had spent much of their time there. Mrs. Simpson died March 10, 1904, and about two weeks after her death, as the plaintiff's sister was preparing to leave and to resume her duties as a teacher, decedent approached her with a proposition that she continue to reside in his family " as one of his girls." Mrs. Carman testified upon the trial that Simpson told her in this conversation that he had already had a talk with her mother, and that he had told her mother that " if she would let my sister come in and live with us he would look out for her while he was living, and provide for her after his death, the same as he would for me;" and that " I should remain up there and my sister was to come up and stop at the house and live with us, so that I would not be lonesome." Mrs. Carman testified that at the time she was tutoring and told her uncle that she did not know how she could break her engagement, but that after talking the matter over with her parents she decided to go and live with her uncle. Plaintiff's sister testified that she was to receive no compensation for her services. The evidence shows that plaintiff and her sister did, in fact, go to live with the decedent, and that the plaintiff's sister assumed all the responsibilities of running the house, engaged the servants, paid the bills, and looked after everything generally, and that plaintiff was always with her, helping if there was anything to be done, and that both plaintiff's sister and herself were treated as members of the family. While it does not appear that there was any agreement as to compensation, the decedent, until 1911, paid the plaintiff forty dollars per month and thereafter twenty dollars per month, as spending money, until plaintiff's marriage, which occurred in 1912, when she left decedent's home and went to live with her husband.

The evidence shows that soon after the plaintiff and her

sister went to live with Simpson permanently, the decedent thought it would be the best way to provide for their future to take out twenty-year policies for each, and that Simpson stated that he would keep up the payments for the two girls. Thereupon the plaintiff and her sister were examined, the policies were issued, and were brought home by the decedent, who asked the plaintiff and her sister if they wished him to keep the policies in his office, and that thereafter Simpson said that he had paid the premiums thereon.

After the marriage of the plaintiff in 1912 she went to live with her husband in the State of Ohio. Originally the policies provided that in case of death prior to maturity the moneys represented thereby and due to each of the girls should be paid to her sister. Upon the marriage of the plaintiff, however, the policies were altered so that any moneys due upon them should be paid upon death of the plaintiff or her sister to the estate of each, respectively.

Mrs. Carman testified that after plaintiff's marriage she told the decedent that plaintiff's husband had changed his position and would not be able to carry her policy, and that decedent told her that after her sister was married her " sister would have to pay the premium on the insurance, her husband would have to take care of the insurance on her after she was married," and that when Mrs. Carman told her uncle that plaintiff's husband simply could not put up the money to pay the insurance, her uncle said that he did not know what he could do, and that thereupon Mrs. Carman stated that the plaintiff would have to lose the insurance or get the money which she knew the decedent had paid in, and that decedent replied: " No, that will never do; she will lose too much money; that will never do. You must fix it some way." Mrs. Carman further testified that about a week or so afterwards decedent came to her one evening and handed her two slips of paper, printed slips, with an indication thereon where the same were to be signed, and told the witness to send one of them to her sister and for the witness to sign one, so that he could " change the form of the policy, thereby saving the insurance for my sister and myself, and he explained at the same time that I would have to sign as well as my sister, because I was my sister's beneficiary. He didn't know just

exactly how he would arrange these two policies, but it was for our benefit whatever he would do." The witness further testified that Simpson urged haste in obtaining the execution of the papers which he presented, and asked the witness to send one of then to her sister and have her sign as quickly as possible, because in the month of February following the insurance came due, and he "would have to arrange something." Mrs. Carman testified that she wrote her sister, in response to decedent's request; that Simpson had suggested that the witness better execute her paper first and then tell her sister that she had done so, and that it was for her benefit to change the policy. Plaintiff's sister further testified that Simpson "didn't know just exactly what form he would change it into, but he gave it to me to sign. To the best of my recollection he told me that he could not do anything for Minna, as she was married, and that he could not pay her policy unless she signed the slip, so that he could arrange it differently."

The transaction, as related by Mrs. Carman, does not show that she had a very lively appreciation of what was occurring, and apparently both she and her sister reposed in the decedent absolute confidence and paid little heed to what they were doing. The assignment executed by plaintiff was returned two weeks later, and plaintiff's sister testified that thereafter Simpson never talked about them, and that it was not until more than three years later that she fully understood and appreciated what had been done, when, for the first time she learned that Simpson had appropriated said policies to his own use. Mrs. Carman testified further that at the conversation at the time Simpson requested her to forward to plaintiff the assignment for plaintiff's execution, he stated that he was going to pay the premium and was going to arrange the policy for her sister's benefit. The plaintiff testified that she received the assignment inclosed in a letter from her sister, Ruby, which she thought, at the time of the trial, had been destroyed; that the letter contained a paper which the plaintiff identified as being the same as that attached to the policy and was the assignment in question; that the plaintiff executed the assignment and acknowledged the same before a notary public.

Plaintiff was unable to recall the contents of the letter, which, for the most part, treated of private matters between her sister and herself, but testified that she remembered a portion of the letter, which read as follows: " Uncle William wishes you to sign the inclosed slip in front of a notary public, as he will have to change the form of the policy to continue paying premiums for you and for your future benefit." And that the letter also contained the following words: " As a few thousand you could collect at the time would not be much."

Plaintiff testified that after execution she mailed the assignment back to her uncle, but had never received any money therefor, and had never received any new policy in place thereof, and had never thereafter had any talk with her uncle in regard to the assignment, and first discovered that she was not to realize upon her insurance after her uncle's death. Mrs. Carman further testified that the next conversation which she had with her uncle with reference to the policy was on an occasion in his room where they met with his sons for the transaction of business before a notary public, and at that time her uncle informed her that his business was very bad, and that he had been compelled to use their policies. Decedent had been, for many years, a successful pawnbroker and, according to the testimony of Mrs. Carman, on the occasion when she was first advised that their policies had been used, decedent said to her that it had been necessary to use " your policies, yours and Minna's, to raise some money," and that he was pressed for money to settle up an estate, but assured Mrs. Carman that it was all right, and that the boys would look after them; that plaintiff's sister then asked the decedent: " What did you do about the policies, Uncle William? " and that the decedent replied: " Nothing, as yet." At that time Simpson had been ill for about six weeks. Mrs. Carman further testified that as she left the room she met decedent's son, the defendant Frederick B. Simpson, in the hall, and that she then said to him: " Uncle William tells me you had to use our insurance." The witness did not testify as to what, if any, reply Frederick made, nor did Frederick deny upon the trial that she made the statement to him with reference to the use of the policies above mentioned. Mrs. Carman in this connection further testified: " I learned then

that I had assigned the policy over to Uncle William," and that she afterwards learned that her uncle had raised money on the policies. The witness stated that for a time she kept the policies herself in a safe deposit box, but afterwards handed them over to her uncle; that before his death decedent informed plaintiff's sister that he had made a will and had provided for her. Mrs. Carman testified, without objection, that the policies were given " as a result of Uncle William asking my sister to come in and live with us."

A circumstance of some significance arises from the fact that Mrs. Carman, upon the trial, testified that she did not acknowledge her assignment of her policy before a notary public, she testifying that the paper which was presented to her by her uncle was a mere printed form, and that she signed at the place where he indicated, the inference being that the same was filled in later. The assignment offered and received in evidence upon the trial, executed by Mrs. Carman under her maiden name of Ruby E. Allen, appears to have been duly acknowledged before a notary public on January 24, 1913. Notwithstanding the testimony of Mrs. Carman that she did not acknowledge said instrument, the notary purporting to have taken her acknowledgment was not produced upon the trial, nor was his absence in any manner explained.

In support of the version of plaintiff's sister as to the circumstances under which plaintiff's policy was issued and thereafter assigned to the decedent, plaintiff's mother testified that at the time plaintiff went to live with decedent she was about sixteen years of age, and that her daughter, Mrs. Carman, was then about twenty-five years of age; that plaintiff's mother had a conversation with decedent soon after his wife's death in which he stated that he wished her two daughters to come to live with him, and that he said: " I will provide for them as long as they live, and I will take care of them if you let them come," and that afterwards decedent told Mrs. Allen that he had taken out the policies in question, and asked her if she did not think he had done right in insuring the plaintiff and her sister, and that Mrs. Allen inquired of him: " How will the policies be kept up? " and that decedent replied: " If anything should happen to me, I will provide for them." The fair interpretation of this testimony of

plaintiff's mother is to the effect, I think, that decedent was to keep up the policies by payment of premiums thereon so long as he should live and until such policies became due and payable, and that in case anything happened to him, he would make suitable provision in his will for keeping said policies alive.

No testimony was given on the part of the defense, except that of the defendant William J. Simpson, who testified as to loans made by the executors and the amounts paid by them to the defendant life assurance society, and that the reason why he and his brother had taken an assignment of the policy in question was that it was necessary to borrow some money upon it and it was suggested by the insurance company that an assignment be taken to the witness and the brother individually so that the loan could be procured.

The insurance policy, together with the assignments, was introduced in evidence, and it was conceded that the amounts found upon the trial had been borrowed upon the policy. The figures stated in the account, as found by the court, also seem to be correct.

While the evidence of the perpetration of a fraud by decedent upon plaintiff by means of which he gained possession of her policy is not strong, still we are confronted with the outstanding facts that the policy was issued to and belonged to the plaintiff and came to her upon due consideration to the decedent, who procured its issuance and who agreed to pay the premiums thereon while living and at his death to make provision therefor. Decedent's promise to provide for keeping said policy alive was not dependent upon plaintiff's remaining single. And then we have the other outstanding fact that at decedent's request and without the slightest consideration therefor, plaintiff, evidently relying implicitly on the honesty and generosity of her uncle, assigned to decedent her said policy. At that time the policy had a very substantial cash surrender value, which the plaintiff, even though she were unable to carry the policy upon her uncle's refusal to longer pay the premiums due thereon, might have obtained upon surrender of said policy. The testimony of plaintiff's sister as to the representations of the decedent that if the policies were assigned to him he would arrange some way of

carrying the same for the protection of the plaintiff and her
sister, is, to say the least, plausible, and, under the circum-
stances, and in view of the very confidential relations that
existed between them it was very natural for the plaintiff
to assign her policy to her uncle when he requested her so to
do. It is quite probable that at the time of the assignment
the uncle intended to continue the payment of the premiums
upon the policy, or, at least, to negotiate some form of con-
tract for the benefit of the plaintiff. Three years later, when
the decedent was in financial distress, he appropriated the
policy, made possible by the assignment which he had obtained
under a promise to protect the plaintiff, and borrowed a large
amount of money thereon, which he used in discharging his
personal obligations. Under such circumstances it is not
difficult to believe that possession of plaintiff's policy was
obtained by the decedent as the result of his representations
and promises to protect her. The facts disclosed by the evi-
dence, I think, sufficiently show that the decedent either
obtained the assignment of the insurance policy by fraud
and false representations, and that he did not intend at the
time of the assignment to protect the plaintiff, or, having
obtained said policy with the best of intentions, afterwards,
under stress of necessity, converted the same to his own
use. The learned trial court saw the witnesses and was best
able to judge as to their credibility, and while the testimony
given upon the question of the perpetration of a fraud by the
decedent was not strong, yet it does clearly disclose that
Simpson procured the assignments for some purpose, and
that while his original intention may have been honest, he
afterwards, finding himself in financial distress, appropriated
the policy to his own use, borrowing said moneys thereon.
I think that in such a situation the plaintiff is entitled to
recover, either upon one theory or upon the other, and that
in either event the plaintiff is entitled to the return of her
policy upon satisfaction of the amount payable to the insurance
company. I know of no theory, however, under which the
plaintiff should be allowed interest on the value of the policy
from January 22, 1913, to November 26, 1920, as found by
the trial court. The sum of $5,929.20, found by the trial
court to have been paid by the executors for premiums and

interest was paid for the benefit of the policy and to protect it, and was not a voluntary payment, but was necessarily made to protect the policy and to prevent the insurance company from foreclosing its lien.

I think the judgment appealed from should be modified so as to provide that the plaintiff is entitled to the return of the policy in question upon payment to the insurance company of the sum of $13,934.36 and interest, and that the plaintiff should have judgment against the defendant executors for the aforesaid sum, less four premium payments of $1,301.80 each, aggregating the sum of $5,207.20, and that interest upon such payments should also be allowed, amounting to $722, leaving a balance for which plaintiff is entitled to judgment against the defendants, as executors under the last will and testament of William Simpson, deceased, of $8,005.16, with interest thereon from the time of the trial. The executors should not be directed to pay the aforesaid sum to the insurance company for the reason that it is alleged in the complaint and not denied in the answer that the estate of the decedent is insolvent, and that such a direction would result in preferring the plaintiff's claim over those of other creditors of the decedent's estate. All that the plaintiff is entitled to is a judgment against the said executors, which judgment can be taken care of in the proper and usual way upon their accounting in the Surrogate's Court. It does not appear from the evidence that the funds realized from the policy can be sufficiently identified or traced, and for that reason the plaintiff occupies the position simply of a general creditor of the estate whose claim will now be in the form of a judgment rendered after decedent's death. (*Matter of Cavin* v. *Gleason*, 105 N. Y. 256; *Matter of Hicks*, 170 id. 195; *Schuyler* v. *Littlefield*, 232 U. S. 707.)

The judgment appealed from should be modified as hereinbefore stated, and as so modified affirmed, without costs to either party as against the other.

CLARKE, P. J., LAUGHLIN, SMITH and PAGE, JJ., concur.

Judgment modified as directed in opinion, and as so modified affirmed, without costs. Settle order on notice.