[Civ. No. 1171.    Third Appellate District.—November 7, 1913.]

THE PEOPLE, by U. S. Webb, Attorney-General, Plaintiff, v. CALIFORNIA SAFE DEPOSIT AND TRUST COMPANY (a Corporation), et al., Defendants; EMMA J. WHITE, Intervening Petitioner and Appellant, FRANK J. SYMMES, Receiver, Respondent.

BANKS AND BANKING—CERTIFICATE OF DEPOSIT—RELATION BETWEEN PARTIES.—A certificate of deposit is substantially a simple receipt of a bank, negotiable in form, for a certain sum of money; it creates no trust relation between the depositor and the bank, but merely the relation of debtor and creditor.

ID.—CERTIFICATE OF DEPOSIT—AMOUNT OF NOT A SPECIAL DEPOSIT.— Where attorneys receive a check from a client with instructions to obtain payment thereof, pay certain claims, and forward the balance to her, and they deposit the check in a bank to the credit of their general account, and subsequently present their check on such account, drawn to the order of the bank, and the bank issues a certificate of deposit for the same amount payable to the client, and the attorneys forward the certificate to her, and thereafter the bank closes its doors and refuses payment of the certificate when presented, a special deposit or trust relation was not thus created in favor of the client, but the money involved continued to constitute a part of the general funds of the bank subject to claims of its creditors without any preference in her favor; there being nothing to show that the bank expressly or impliedly agreed to hold the money in trust for her or her assignee, or that it agreed to transmit the money to her.

ID.—GENERAL AND SPECIAL DEPOSITS DISTINGUISHED—INTENTION OF PARTIES.—A general deposit is one which is to be repaid on demand in money. A special deposit is one in which the depositor is entitled to the return of the identical coin or other article deposited. Whether a deposit is general or special depends upon the intention of the parties. A deposit will, however, always be deemed to be general, unless made special by agreement. And something more than the intent of one of the parties is necessary to make a deposit special; the intent of both parties must be shown to concur, either expressly or by implication.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Aitken & Aitken, for Appellant.

De Laveaga & Magee, for Respondent.

CHIPMAN, P. J.—The action to recover the sum of $847.50, alleged to be held by defendant, said trust company, as a special deposit and as the property of petitioner, Emma J. White.

At the close of petitioner's evidence, the motion for a nonsuit, made by said receiver, was granted. The appeal is from the judgment of nonsuit and from the order denying motion for a new trial.

The facts in the case appear from the testimony of Frank W. Aitken, as follows:

"On or about October 14, 1907, Aitken & Aitken received one thousand dollars, the property of Emma J. White, in the form of a check on a bank in Oakland, under instructions from her to obtain payment thereof, compromise and pay certain claims, and forward the balance to her, and deposited said check with the California Safe Deposit and Trust Company, Fillmore Street branch, to the credit of Aitken & Aitken. I am and on and since said date have been one of the members of said firm of Aitken & Aitken. On October 30, 1907, at about half past twelve o'clock, noon, I presented to the California Safe Deposit and Trust Company, Fillmore Street branch, a check on said account, drawn to the order of said bank, in the sum of $847.50. I presented that check to G. Chevassus, who was the accountant and acting as the paying teller. I told him that we wanted to have the money sent to Tacoma; that it was to be paid to Mrs. Emma J. White at that city. He referred me to Mr. Dawson, who was one of the bank clerks. I told Mr. Dawson that I had given Mr. Chevassus a check for $847.50 and that the money was to be sent to Tacoma and paid to Emma J. White at that city. He said the most convenient way would be to have a certificate

of deposit issued, payable to Mrs. Emma J. White, and that she could indorse the certificate and deposit it in a Tacoma bank, and upon its return to the California Safe Deposit and Trust Company it would be paid. I told him that that way would be satisfactory, and the California Safe Deposit and Trust Company then issued its certificate of deposit for $847.50 and delivered it to me. Said certificate of deposit was as follows:

"Uptown Branch,

"California Safe Deposit and Trust Company.

"1740 Fillmore Street, South of Sutter.

"San Francisco, California, Oct. 29, 1907.

"No. 585.

"This is to certify that Aitken & Aitken have deposited with California Safe Deposit and Trust Company of San Francisco, California, the sum of eight hundred forty-seven 50/100 dollars $847.50. Payable to the order of Mrs. Emma J. White in lawful money of the United States on the return of this certificate properly indorsed.

"(Signed) S. H. Patterson,        G. Chevassus,
           "Accountant.          Branch Manager.

"Not subject to check.
"Certificate of Deposit          "Payable only through
"Payable without interest    .      "San Francisco
                                  "Clearing House.

"We sent the certificate to Mrs. White at once. It was presented to the California Safe Deposit and Trust Company, through a bank in Tacoma, but payment was refused."

He testified further: "I did not get back the check from Mr. Chevassus, the paying teller. When I gave it to him he kept it and informed Mr. Dawson of it. I walked down the aisle to another part of the bank where Mr. Dawson was; I told him I had given the check to Mr. Chevassus. The check was returned to us afterward. It was perforated with the word 'Paid' and the figures '10-30-07.' We afterward received a statement from the California Safe Deposit and Trust Company showing that the $1,000.00 had been received from the bank in Oakland on or about October 14, 1907, and that the check referred to, for $847.50, had been withdrawn and deducted from the account on October 30, 1907."

It was admitted by the receiver "that the check was duly charged to the account and entered as paid on October 30, 1907."

It seems to be conceded that the bank suspended business at some hour after the transaction above narrated. The certificate is dated October 29, which was probably an inadvertence, as it was issued on October 30. No question arises out of the fact that the bank suspended on the day the certificate was issued.

Appellant states her position thus: "On these facts it seems clear that the $847.50 constituted a deposit for a specific purpose—payment to Mrs. White at Tacoma, through whatever bank might present the certificate after she had indorsed it. Such a deposit, described by several courts as a 'special' deposit or as a 'specific' deposit (or deposit for specific purpose), is uniformly considered a *trust deposit* which does not become the property of the bank, but may be recovered in full, after insolvency, in preference to the claims of general depositors." Again: "It is not material that the deposit in this case was not in actual money and did not at the moment add actual visible assets. A check on an existing sufficient balance, drawn to the bank's order, and taken by the bank as cash, must be considered equivalent to actual money; and as such check could have been cashed and the money handed over the counter, it is immaterial that the bank assumed, instead, to cash it behind the counter instead of demanding the useless formality of having the money handed out and forthwith handed back again."

Respondents's position is thus summed up: "First, No specific deposit for a definite purpose was made, hence, no trust fund was created by the issuance of the certificate of deposit to appellant; second, No actual deposit of money was made at the time the certificate of deposit was issued, hence, the assets of the bank were not increased by the transaction in question, and without an actual increase of assets no preferred claim could possibly arise."

The original deposit of the one thousand dollars on October 14th, was a general deposit and created the relation of debtor and creditor between the bank and the depositors, Aitken & Aitken. (2 Morse on Banks and Banking, sec. 568.) In

point of fact, they were Mrs. White's agents and the money belonged to her.

The case, therefore, is simply that of a depositor desiring to have a portion of her deposit remitted to her at a distant place. Did her agents, in accomplishing this purpose, so conduct the transaction as to convert the $847.50 into a special or specific fund or to make the bank a trustee of Mrs. White and a holder in trust of that money for her? Mr. Aitken's testimony simply shows that the depositors, Aitken & Aitken, wanted to send the money to Mrs. White at Tacoma and were told that the most convenient way would be to take a certificate of deposit payable to her and she could indorse it and get her money through a Tacoma bank upon the return of the certificate. Mr. Aitken adopted this method. Unfortunately, the bank became insolvent and the certificate was not paid. We cannot discover any request made of the bank to send the money, or any agreement by it to send the money. The same result might have been accomplished had the bank certified the check given by Aitken & Aitken, and had they sent it to Mrs. White, or by a draft upon some bank at Tacoma or elsewhere.

There was no money in fact deposited by Mrs. White and there was no withdrawing of any money from the bank. The check for $847.50 was marked paid and reduced the credit account of her agents, Aitken & Aitken, by that much and on the bank-books the amount was doubtless charged to outstanding certificates of deposit account. There is no evidence that the bank expressly or impliedly agreed to hold this money in trust for Mrs. White or her assignee, nor did it agree to transmit the money to her. True, it is our duty, in case of judgment on nonsuit, to give to the evidence the most favorable interpretation of which it is reasonably susceptible in support of petitioner's claim. If it could be reasonably inferred from Mr. Aitken's testimony that, notwithstanding the fact that the certificate of deposit strongly rebuts the idea of a trust relation, his intention was to create such trust and what he said and did was so understood by the bank or must be presumed to have been so understood by it from what was said and done, we think the rules of law would require of us to accept such understanding of the parties. But we fail to discover in anything said or done by Mr. Aitken at

the time from which he had a right to assume that the bank officers understood the bank's relation to Mrs. White to be other than that created by the certificate of deposit. The certificate of deposit has none of the earmarks of a special deposit of money which the bank had no right to mingle with its funds or treat as its own. On its face it creates the relation of debtor and creditor between itself and Mrs. White. Aitken & Aitken were her agents in the matter and for her consented that the transaction should take this form, and it seems to us the certificate is very significant, if not conclusive, as showing what the understanding was.

Mr. Morse says such certificates are but acknowledgments of the bank that it has received from certain persons certain sums of money. "In form they are substantially simple receipts of the bank, in negotiable form, for so many dollars, and so are only evidence of an indebtedness, like the bankbook." (1 Morse on Banks and Banking, sec. 297.) "They create no trust relation between the depositor and the bank, but merely that of debtor and creditor." (Id., sec. 298. See, also, *Murphy* v. *Pacific Bank,* 130 Cal. 542, [62 Pac. 1059].)

In our opinion, the money involved continued to constitute a part of the general funds of the bank subject to claims of its creditors without any preference in favor of Mrs. White. Such would seem to us to result from the views taken by the courts and law writers, some of which we will notice. The definitions given of general and special deposits do not differ materially. In *Butcher* v. *Butler,* 134 Mo. App. 61, [114 S. W. 564], the court said: "A general deposit is where the bank is given custody of the money deposited with the intention expressed or implied that the bank is not required to return the identical money, but only its equivalent; the legal title to the money in such cases passing to the bank. A special deposit is one where the bank merely assumes charge or custody of the property without authority to use it, the depositor being entitled to receive back the identical thing deposited in which case the title remains with the depositor, and if the subject be money, the bank has no right to mingle it with other funds." Our own supreme court has said: "Whether the special deposit be under a contract of bailment for the better protection of the bailor's property, or under a contract of pledge as security for some specific obligation of

the pledgor, title does not pass to the bailee or pledgee, but remains in the pledgor. The pledgee acquires no right to make general use of the property." (*Anderson* v. *Pacific Bank,* 112 Cal. 601, 53 Am. St. Rep. 228, 32 L. R. A. 479, 44 Pac. 1063].) The supreme court of Arkansas thus defines a special deposit: "If the agreement between a bank and its depositor is that the identical coin or currency shall be laid aside and returned, it is a special deposit, but if the money is to be returned, not in the specific coin or currency deposited, but in an equal sum, it is a general deposit." (*Warren* v. *Nix,* 97 Ark. 374, [135 S. W. 896].)

"In using deposits made for the purpose of having them applied to a particular purpose the bank acts as the agent of the depositor, and if it fail to apply it at all, or misapply it, it can be recovered as a trust deposit." (5 Cyc. 515.) Mr. Morse says: "When money is deposited to pay a specified check drawn or to be drawn, or for any purpose other than mere safekeeping, or entry upon a general account, it is a specific deposit, and title remains in the depositor until the bank pays the person for whom it is intended, or promises to pay it to him. . . . A deposit of money to pay a specified note is a specific deposit." (1 Morse on Banks and Banking, sec. 185.) "A deposit is general unless expressly made special or specific." (Id., sec. 186.)

An extended note is found in the report of the *Piano Manufacturing Company* v. *Auld,* 14 S. D. 512, [86 N. W. 22], in vol. 86 Am. St. Rep. 775 et seq., giving a very full discussion of the question: "When a bank does not take title to money deposited with or collected by it and the right to recover such money upon the insolvency of the bank." Among other propositions supported by numerous decisions is the following: "It is well settled that the estate of the insolvent bank must actually be augmented by the money or property which it is sought to recover as a trust fund. If the transaction amounted to no more than an exchange of creditors, the mere canceling of one liability and the assumption of another, or if the money was used in the discharge of an indebtedness, it is obvious that the assets in the hands of the receiver have not been increased thereby, and there can be no recovery as of a trust fund." (P. 806.) Again, as to what constitutes a special deposit: "It is in many cases a very

doubtful question whether a deposit is general or special. The distinction is theoretically plain. A general deposit is one which is to be repaid on demand in money. A special deposit is one in which the depositor is entitled to the return of the identical coin or other article deposited. The difficulty lies in the determination of what was intended by the parties to the deposit. Whether a deposit is general or special depends, of course, upon the intention of the parties. A deposit will, however, always be deemed to be general, *unless made special by agreement.*" (P. 778.) Something more than the intent of one party to the deposit is necessary—the intent of both parties must be shown to concur either expressly or by implication.

Appellant, in applying the rule laid down by Mr. Morse, claims that "the certificate of deposit was the note of the bank to Mrs. White." While some courts have so held, most of the courts and our supreme court hold otherwise. (*Murphy* v. *Pacific Bank,* 130 Cal. 542, [62 Pac. 1059].) Appellant, in confirmation of her application of the rule, cites numerous decisions. But, with one or two exceptions, which will be noticed, they are clearly distinguishable from the case here. For example, one bank sent a note to another bank for collection; the note was collected, but before the money was remitted the latter bank failed. (*Capital National Bank* v. *Coldwater National Bank,* 49 Neb. 786, [59 Am. St. Rep. 572, 69 N. W. 115].) In another case, the bank received the money for the express purpose of paying it to the holder of a note. (*Ryan* v. *Phillips,* 3 Kan. App. 704, [44 Pac. 909].) In another, the bank received the money, in its trust capacity, for the specific purpose of security for the benefit of a third person. (*Woodhouse* v. *Crandall,* 197 Ill. 104, 58 L. R. A. 387, 64 N. E. 292].) Again, in *Star Cutter Co.* v. *Smith,* 37 Ill. App. 215, the money was deposited for the express purpose of paying a particular check when presented. The money was not credited to the general account of the depositor. In *St. Louis* v. *Johnson,* 5 Dill. 241, Fed. Cas. No. 12,235, money was sent to a bank in New York city to pay certain bonds of the city of St. Louis. In *Shopert* v. *Indiana Savings Bank,* 41 Ind. App. 474, [83 N. E. 515], money was deposited for the express purpose of paying a third party the purchase price of a machine.

In all these cases the deposit was made subject to an agreement by the bank that the money would be used in some particular manner or to pay some specified third person. Where, however, the deposit is for the credit of the depositor or some other person, as in the case of a certificate of deposit, there is no intent to make a payment of some specific claim of a third person, as in the cases cited. There was here no agreement by the bank to pay the specific claim of Mrs. White. Its agreement was to pay the certificate of deposit according to its terms and it implied no obligation to hold as a trust fund the amount called for in the certificate. The distinction is aptly stated by the United States supreme court, in *Libby* v. *Hopkins,* 104 U. S. 303, [26 L. Ed. 769] : "When A sends money to B with directions to apply it to a debt due from him to B it cannot be construed as a deposit though B be a banker. The reason is plain—the consent of A that it was to be considered as a deposit and not a payment is necessary and is wanting." If Mrs. White may be treated as the owner of the money originally deposited, which was the fact, there was no change in the deposit save as to its form. The relation of the bank did not change, but it remained her debtor. Had Mr. Aitken purchased a draft and remitted it, his check being charged to his account, no trust fund would have resulted. (*People* v. *Merch. & Mech. Bank,* 78 N. Y. 269, [34 Am. Rep. 532].)

Respondent contends, with much earnestness, that, as there was no increase of assets of the bank, a preferred claim could not possibly arise. Attention is called to the fact that the deposit of appellant's money was made more than two weeks before the bank closed its doors, admittedly a general deposit, title to which money passed to the bank. On the day the bank closed and when the form of appellant's claim was changed to that of a certificate of deposit for a portion of her account, no money whatsoever was deposited. Obviously, it is contended, no new assets to the bank were added and no additional $847.50 was received by the bank and hence no fund of that amount was ever added to the assets of the bank or ever reached the hands of the receiver. That the claimant of a trust fund must trace and identify his property in order to establish a preference is stated as a proposition established and fully demonstrated in *Cavin* v. *Gleason,* 105 N. Y. 256,

[11 N. E. 504]. Other cases are cited to the proposition. (See, also, note in 86 Am. St. Rep. 775.)

Appellant relies on two cases which she claims controvert the proposition just stated and also sustain her right to recover in this action. One of these is *People* v. *City Bank*, 96 N. Y. 32, and the other is *Stoller* v. *Coates*, 88 Mo. 516. In the New York case, the firm of Hartwell, Hough & Ford had a deposit in the City Bank of Rochester. It gave the bank certain checks drawn against its account in that bank, to be applied in payment of certain notes discounted by the bank. The opinion states that ''the checks of the petitioner were money assets in the hands of the bank, and were so treated by all of the parties; they were delivered to it *with specific directions to apply the proceeds on payment of the notes;* those directions were assented to by the bank officer and the checks collected from that fund. From that moment the bank was bound to hold the money for, and apply it to that purpose, and no other, or failing to do so, return it to the petitioner. As to it the bank was bailee, or trustee, but never owner''; and it was held that the notes should be paid out of the assets in the hands of the receiver. Here was a clear agreement by the bank to apply the proceeds of the checks to a specific purpose. In the present case we find no such agreement.

In a subsequent case, *Cavin* v. *Gleason*, 105 N. Y. 256, [11 N. E. 504], speaking of *People* v. *City Bank of Rochester*, 96 N. Y. 32, it was said that the court in that case ''did not decide that the petitioner would have been entitled to a preference in case the proceeds of the checks had been used by the bank, and were not represented in its assets in the hands of the receiver.''

*Stoller* v. *Coates*, 88 Mo. 516, is cited as illustrating a transaction substantially the same as the one here. One Earnest, of Colorado, consigned to plaintiff, under the firm name of Stoller & Hill, of Kansas City, ten car loads of cattle, to be sold for his account. Stoller & Hill were requested, by instructions accompanying the consignment, to deposit the proceeds of sale in the Exchange Bank of Colorado, to his, the assignor's credit. The gross proceeds amounted to $3,769.75, in the form of a draft. Stoller & Hill took the draft to the Mastin Bank for the purpose of carrying out their instructions. The net proceeds due the consignor were a little

less than the draft. They deposited the draft to their credit and immediately drew a check for the net proceeds to be transmitted to the consignor in Colorado. With the check they requested the bank to place the proceeds in the Exchange Bank of Denver, in Colorado, to the credit of Mr. Earnest, the consignor. The Mastin Bank agreed to do this. The Mastin Bank failed before the money was paid and it was held that a special deposit was constituted. The court said: "When Stoller & Hill drew their check for $3,757.56, on the Mastin Bank and delivered the same to the bank, payable to the bank or indorsed over to it, they placed a specific fund in the hands of the bank. The bank was also advised sufficiently that Mr. Earnest was the ultimate owner or beneficiary of the fund. The *bank agreed to transmit this fund to the Exchange Bank of Denver, to be received by said bank for the use of Earnest.*" There was not only in that case a deposit of what was treated as money at the moment of drawing the check, but an agreement of the bank to transmit the fund. Both of these features are wanting in the present case.

It was perhaps not necessary for the Aitkens to enact the idle and useless ceremony of receiving the money on their check and immediately passing it back to the bank in order to have impressed the fund with a trust and to have made the bank the agent of Mrs. White for the transmission of the money. (*British etc. Co.* v. *Massey,* 63 Iowa, 468, 471, [19 N. W. 319].) But they should at least have clearly placed the responsibility upon the bank of remitting the money, as was done in the Missouri case, in order to constitute it a specific fund in its hands.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 6, 1914.

Beatty, C. J., dissented from the order denying a rehearing in the supreme court and filed the following opinion thereon:

BEATTY, C. J.—I dissent from the order denying a rehearing, not because I am convinced that the judgment of the

district court of appeal is erroneous, but because the question involved is a new one in this state, upon which the authorities in other jurisdictions are not in harmony; and more particularly because the case is not, as stated in the opinion of the appellate court "simply that of a depositor desiring to have a portion of her deposit remitted to her at a distant place." The transaction was in fact of a radically different character. The certificate of deposit was not an ordinary certificate of deposit importing the ordinary relation between the bank and the holder of the certificate. Mrs. White did not make the deposit either by herself or an agent. Aitken & Aitken had been her agents for the settlement of certain claims against her, but the money furnished them for that purpose had been deposited to their credit and they had become her *debtors* for the balance remaining after deducting the amount of the claims paid and the value of their services. When an agent is accounting to his principal and paying over the balance due his principal he is not acting in the character of agent, but in that of a debtor paying his creditor—and such was the transaction here. Not only was that the real transaction, but it was precisely in the character of a debtor to Mrs. White that Mr. Aitken presented the matter to the bank. He made no pretense of agency. All he asked was that the bank should accommodate him by paying $847.50 of his money to Mrs. White at Tacoma. By drawing and delivering his check in favor of the bank on his account he gave the bank that amount of his money—and the agreement of the bank was that Mrs. White, a stranger to the transaction, should get the money. The failure to pay her was a violation of its agreement with Aiken & Aiken, acting for themselves—not acting for her.

Whether this view of the case would alter the result I am not prepared to say, not having had the time to examine the numerous authorities cited in the opinion and briefs of counsel, but I am convinced that it would render inapplicable many of the authorities cited in the opinion as to the rights of the holder of an ordinary certificate of deposit.

In a case so novel and important, and so easily distinguishable from the ordinary transaction to which it has been likened, I think further consideration is due.