In re Oscar Nelson, Auditor of Public Accounts of the State of Illinois, v. John B. Colegrove & Co. State Bank.

Charles H. Shamel, Appellant, v. Robert G. Earley, Receiver. John B. Colegrove & Co. State Bank, Appellee.

Gen. No. 8,650.

58

Heard in this court at the April term, 1932. Opinion filed October 17, 1932.

PROVINE & WILLIAMS, for appellant.

OSCAR J. PUTTING, for appellee.

MR. PRESIDING JUSTICE ELDREDGE delivered the opinion of the court.

On October 10, 1929, the John B. Colegrove & Co. State Bank of Taylorville, Illinois, was closed by the auditor of public accounts and subsequently Robert G. Earley was appointed receiver thereof. John B. Colegrove was a stockholder and president of the bank and Charles H. Shamel, appellant, was a stockholder thereof.

Appellant filed an intervening petition in which it is alleged that during July and August of the year 1929, Colegrove, then president of the bank, entered into negotiations with the petitioner upon the subject of assisting the bank to obtain money for its current

use; that as a result of such negotiations, the petitioner, at the request of John B. Colegrove, loaned to the bank to be used by it as collateral security to a loan or deposit of $10,000 of State funds from the State treasury, certain bonds; that it was agreed that the identical bonds mentioned should be returned to the petitioner, on or before December 1, 1929; that the petitioner was not to receive interest or compensation or consideration of any kind for the loan of the bonds; that an instrument in writing in relation to the loan of the bonds was executed and is attached to the petition; that in pursuance of the agreement, petitioner delivered the bonds to Colegrove as the president of the bank, for its use and said bonds were of the value with accrued interest of approximately $12,000; that Colegrove, as president of the bank, obtained from the State treasurer on the security of the bonds, $10,000 belonging to the State, and used and applied the same in the current business of the bank, and that the bank has enjoyed the entire use and benefit thereof; that all of the funds deposited by said treasurer in said bank were money and property of the State of Illinois, derived from taxation and entitled to priority in the payment of claims and debts against the bank; that subsequently the bank was closed by the auditor of public accounts and a receiver appointed; that the receiver has in his custody and possession said bonds or the proceeds thereof but declines or refuses to return the same to petitioner without the order of the court, although the agreed time for the return of the bonds was long past; that by virtue of the premises, the bonds were held as and constituted an express trust by the bank, from which it derived great benefit, and the bonds, including the interest coupons attached thereto, should be returned to petitioner, and that he should be reimbursed for the expenses incurred by him in connection therewith; that

petitioner should be subrogated to the rights of the State of Illinois against the bank; that at the time of the delivery of said bonds to the bank, the petitioner received as collateral security to secure their return, three certain promissory notes each secured by a real estate mortgage, the face value of such notes being $14,075; that the petitioner is ready and willing and offers to execute reassignments of the notes and mortgages to the bank and to take such other steps necessary to legally affect the transfer, upon the return to the petitioner of his bonds, the interest coupons thereon and his expenses; that petitioner asks the aid of the court in the premises and that the court order the return of the bonds in question, or others of the same name, denomination and value, and that the petitioner might have such other and further relief as equity might require.

The receiver filed an answer in which he denied substantially every material allegation alleged in the intervening petition. The hearing was had before the chancellor. The proofs are meager and incomplete. Appellant testified that during the months of July and August, 1929, Shamel had several conversations with Colegrove in the bank; that these conversations related to the financial condition of the bank during that period of time; that the first one occurred in July wherein Colegrove told Shamel there had been heavy withdrawals of money from the bank and it needed some ready money, and requested the latter to buy some mortgages to help the bank out, saying in substance, "You are one of the stockholders of the bank, and the rest of us have helped the bank out, and you ought to do something"; that Shamel asked Colegrove what mortgages he wanted to sell and Colegrove named a number of mortgages and that Shamel told him that the property was not worth the money loaned on them and that he would not buy any such mort-

gages. The next conversation occurred in the fore-part of August in which Colegrove again requested Shamel to purchase some other mortgages which Shamel refused to do, stating that they were no better than the former ones offered to him. The next conversation occurred on or about the 31st day of August in which Colegrove told Shamel that he now had good mortgages which he would assign to Shamel if the latter would let him have some bonds which he owned for the purpose of depositing them with the State treasurer so he could get $10,000 of State money as a deposit in the bank which was badly needed to keep the bank open; that Colegrove offered to Shamel at this time certain notes executed by Samuel Peat and wife and a mortgage securing them, certain notes executed by Grace Flesher and a mortgage securing them and certain notes executed by Martha L. Perrine and husband and a mortgage securing the same; that Colegrove stated that said mortgages and notes were the property of the bank and were all first mortgages and showed the abstracts of the property covered by the Flesher and Peat mortgages; that Shamel asked Colegrove for the abstract to the Perrine property but the latter made some excuse and said he would get that abstract and deliver it to the witness later, but that it was good property, a first mortgage, and that Colegrove would guarantee it; Shamel further testified that he examined the abstracts of title of the land covered by the Flesher and Peat mortgages and said to Colegrove that while he was familiar with the land in a general way he ought to have time to go and look at it, to which Colegrove replied that he was in a hurry and had to get to Springfield that morning as the State treasurer's office would close at noon; that at the time of this conversation the bonds owned by Shamel were in a vault in a building next to the bank building and Shamel procured them and took them to the bank. Thereafter the following transactions

took place. Colegrove executed the following note and signed it personally in his own name and not in the name of the bank nor as president of the bank: "$11,550.00 Taylorville, Ill., *Aug. 29th* 1929 *On December 1st 1929* after date, I promise to pay to the order of *Charles H. Shamel Eleven Thousand and Five Hundred and Fifty* Dollars at the John B. Colegrove & Co., State Bank, Taylorville, Illinois, for value received, with interest at the rate of seven per cent per annum, after date until paid.

"As collateral security for the payment of this note and any other present or future liabilities of the undersigned, or either or any of us to the holder thereof, whether direct or acquired by assignment, and whether absolute or contingent, the undersigned do (es) hereby assign, pledge and deliver to said holder the following property:

"Mortgage and Notes signed by Samuel Peat & wife dated Oct. 15, 1924 on NW¼ SW¼ and S½ SW¼ Sec. 36 Tp. 12 N, R 3 west of 3rd P. M. for amount of $6,700.00.

"Mortgage and Notes signed by Grace Flesher dated Sept 17-1924 on S½ NW¼ Sec. 23 Tp. 13 N, R 1 West of 3rd P. M. for amount of $4,000.00.

"Mortgage and notes signed by Martha L. Perrine & Husband Dated Mar 1st 1925 on N½ NE¼ SE¼ and S½ S½ SE¼ NE¼ Sec. 10 Tp 14 N, R 2 W of 3rd P.. M. for amount of $3,375.00."

This note also contains the usual provisions and conditions in regard to collateral securities found in notes providing therefor. On the back of the note appears the following:

"The following agreement is made a part of the within described Note I agree on or before Dec. 1st 1929 to Return to C. H. Shamel the following identical Bonds which I have borrowed from him $10000.00 Imperial Japanese Government Bonds 6½ Series 1954 No. 126695-704 Coupons Feb. 1, 1930 & Thereafter

$1,550.00 Liberty Bonds 4¼ S 1938. Go1903477 for $1,000—Go8732277 for $500.00 and Jo588083 for $50.00. Coupons Oct. 15, 1929 and Thereafter and pay expenses, insurance & etc. from Washington, D. C. to Taylorville & return To There. No coupons to be removed by me from said bonds.

John B. Colegrove"

The note with the indorsement thereon together with the collateral notes, and the mortgages securing them respectively, and also the written assignments of said mortgages were delivered to Shamel and he in return delivered his bonds to Colegrove who deposited them with the State treasurer as security for a deposit of $10,000 made by the latter in the bank. These bonds consisted of 10 Imperial Japanese Government External Loan of 1924, 30-year sinking fund, 6½ per cent gold bonds, due February 1, 1954, with February 1, 1930 and subsequent coupons attached of the par value of $1,000 each and three United States Fourth Liberty Loan 4½ per cent gold bonds due October 15, 1938, with October, 1929 and subsequent coupons attached of the aggregate value of $1,550. After the closing of the bank the State treasurer sold four of the Japanese Government Bonds and all of the United States Government Liberty Bonds for the sum of $5,786.71 which sum together with certain amounts realized by the State treasurer upon the sale of other bonds deposited by the bank with him made up an aggregate sum of $113.08 in excess of the amount necessary to liquidate the deposit of the State treasurer with the bank, which latter sum of money together with the six remaining Japanese Government Bonds not required to liquidate the account of the State with the bank were returned by the State treasurer to the receiver of said bank who sold the Japanese Government Bonds for the sum of $6,281, which sum the re-

ceiver now has in his hands and has kept the same in an interest account upon which he has received two per cent per annum.

Colegrove was not produced as a witness and there is no evidence of the negotiations leading up to the delivery of appellant's bonds to Colegrove except that of appellant.

The chancellor decreed that as to the amount received by the State treasurer from the sale of the bonds made necessary to liquidate the account of the State treasurer with the bank he should share as a general creditor, but as to the excess amount of $113.08 cash and the sum of $6,281 received by the receiver from the sale of the six Japanese Government Bonds returned to the latter his claim was entitled to preference.

It is contended by appellant, Shamel, (1) that the transaction between him and Colegrove whereby he was induced to turn over to Colegrove the bonds in question for the use of the bank created a trust relationship which was not changed by the appointment of the receiver and that as the transaction was one for the benefit of the bank it was bound thereby; (2) that the transaction in question was a bailment and not a sale and the bank never became an owner of the bonds; (3) that the bank held said bonds in trust for the reason also that they had been obtained from appellant for the use of the bank, by the fraud and misrepresentation of its president; (4) that as a result of the transaction the bank became the debtor of the State and appellant became a surety for the bank to the State in the same manner as if he had indorsed the note of the bank and thereby became subrogated not only to the claim of the State but to all rights, privileges and priorities of the State itself.

The third and fourth propositions will be disposed of first. The alleged fraud is based upon the fact that appellant testified that Colegrove told him that all

the mortgages received by him from Colegrove as collateral security were first mortgages when in fact one of them was a second mortgage; and that all the said mortgages were the property of the bank when in fact another party claims to own or have some interest in two of them. The abstract of the property covered by said alleged second mortgage was not introduced in evidence nor was there any documentary proof showing that it was in fact a second mortgage. There was no substantive evidence that all the mortgages were not in fact first mortgages and no positive proof that said mortgages were not owned by the bank. However, there are no allegations in the intervening petition charging fraud of any kind in regard to the transaction in question between Colegrove and appellant. The court in its decree did not pass upon any question of fraud and there is nothing in the record to show that the issue of fraud was raised or presented before the chancellor and it cannot be raised in this court for the first time.

The contention that appellant became a surety for the bank to the State and thereby became subrogated to all the right, privileges, and priorities of the State itself cannot be sustained. The State acquires its priority over other creditors by virtue of its sovereign right under the common law (*People v. Farmers State & Savings Bank,* 338 Ill. 134) but we know of no rule whereby such sovereign right can be delegated or assigned to an individual by subrogation or otherwise.

The remaining contentions of appellant may be embraced in the one proposition whether the chancellor erred in not finding that the proceeds of the bonds sold by the treasurer, in order to satisfy the bank's indebtedness to the State, should also be entitled to priority. This is an equitable proceeding and while equity will administer the assets of an insolvent corporation upon the principle that equality is equity and

will respect legal rights and liens previously acquired (*Atwater v. American Exch. Nat. Bank*, 152 Ill. 605), it will also, in order to ascertain and carry out the intention of the parties to a particular transaction, look at their situation and the whole transaction between them. (*Frink v. Cole*, 5 Gilm. [Ill.] 339.) A court of equity will always attempt to ascertain the real intent and purpose of the parties to a contract, and when discovered will give effect to such intention, and will look to the substance rather than the form of the transaction in reaching a determination of the material questions involved. Appellant and Colegrove were stockholders in the bank. Each knew that it was in a precarious condition financially. It was for the interest of each to keep the bank open and in condition to carry on its business. What was done by both parties was for the interest of the bank and incidentally for themselves. Appellant was a practicing lawyer and well able to protect himself. He knew the purpose for which his bonds were to be used and consequently knew that when they were put up as a guarantee for the payment of the deposit of the State in the bank they could be legally used by the treasurer to fulfill that guarantee. The contract made between Colegrove and appellant was necessarily subject to such a condition although not written therein. Appellant knew the financial condition of the bank and that his bonds or part of them might have to be appropriated by the treasurer to satisfy the deposit of the State therein, and that under such circumstances the return of the bonds to him under the terms of the contract would be an impossibility. His action in turning over these bonds was voluntary and with full knowledge of the use that might be made of them by the treasurer. He was not a stranger to the bank but a stockholder therein and whatever benefit the bank received by obtaining the said deposit from the State treasurer would also

be a benefit to him. It was said by the Court of Appeals of Ohio in the case of *Ramisch v. Fulton*, 41 Ohio App. 443, 180 N. E. 735: "When control of a bank for liquidation purposes is taken by the superintendent of banks, the question of preference creates in reality a controversy between the depositor claiming a preference and the other depositors who are general creditors, inasmuch as the assets in which all are to participate are diminished to the extent of whatever preferences are allowed. The creation of preferences, generally speaking, should therefore be discouraged except in cases where the right thereto is clearly established. As said in *Cavin v. Gleason*, 105 N. Y. 256, at page 262, 11 N. E. 504, 506: 'The equitable doctrine that, as between creditors, equality is equity, admits, so far as we know, of no exception founded on the greater supposed sacredness of one debt, or that it arose out of a violation of duty, or that its loss involves greater apparent hardship in one case than another, unless it appears, in addition, that there is some specific recognized equity founded on some agreement, or the relation of the debt to the assigned property, which entitles the claimant, according to equitable principles, to preferential payment.' '' We believe the chancellor by his decree has done full equity between the parties to this controversy with one exception. The evidence shows that the appellant has retained possession of the notes and mortgages delivered to him by Colegrove and has brought suits to foreclose said mortgages and has offered in his intervening petition to assign the notes and mortgages to the receiver. This should have been ordered in the decree as it would not be equity to permit him to retain these securities and at the same time obtain a preference for the greater portion of his claim. The receiver, however, has not presented or pressed this point and it is not before us for consideration.

On April 9, 1932, appellee filed a motion in this court for leave to assign certain cross errors on the record which motion was granted. These cross errors which this court granted leave to assign are to the effect that the chancellor erred in finding that the transaction involved was between the bank and appellant while the proofs show that it was between Colegrove personally and appellant and therefore no claim should have been allowed in favor of appellant either general or preferred. Rule Three of this court provides: "The appellee shall have the right to assign cross errors within two days after the record is filed in this court, and not afterwards without special leave of the court. The assignment of errors and cross errors *must be written upon or attached to the record.*" No cross errors have been written upon or attached to the record in this case. The mere granting of leave by a court to do a certain thing is of no avail unless the thing is done. The party procuring such leave may or may not, at his option, take advantage of the privilege granted but if he does not do so, the privilege is abandoned. We cannot therefore consider these cross errors.

The decree of the circuit court is affirmed.

*Affirmed.*